JERRY E. SMITH, Circuit Judge:
This appeal challenges $6,000,000 plus interest and attorneys’ fees awarded upon jury findings that officers of a holding company fraudulently induced a $5 million loan to a subsidiary and that they thereafter “looted” the named borrower’s assets and thus tortiously interfered with its contractual obligations to the lender. The district court also granted judgment notwithstanding the verdict with regard to claims that the individual owner and the holding company were the “alter egos” of the borrower and its guarantors. We affirm in part, reverse in part, and remand for a redetermination of damages.
I. Overview.
Gibraltar Savings’ $5 million note was defaulted upon by the named borrower, a real estate development corporation, subsidiaries of which participated in multiple limited partnerships. The lender sued the borrower, its director-guarantors, and the borrower’s corporate parent (also a guarantor) and its parent corporation (a holding company) and its individual owner. The borrower, its corporate parent, and other related enterprises are now insolvent. The individual director-guarantors have settled with Gibraltar.[1] This case was tried solely against the last links in the chain: entrepreneur Lloyd D. Brinkman and his principal holding company, LDBrinkman Corp. The entity to which Gibraltar made the loan was a real estate development subsidiary of a mobile home manufacturer wholly owned by LDBrinkman Corp., which also was the parent company of most of Brink-man’s other ventures.[2]
The jury awarded Gibraltar Savings $6 million against the defendants as the borrower’s (and its parent-guarantor’s) “alter ego,” and for both fraud and tortious interference with the borrower’s contractual relationships with regard to the loan Gibraltar negotiated for it through the holding *1278 company. The trial court granted, in part, the defendants’ motion for judgment notwithstanding the verdict, finding the “alter ego” theory unsupported by the evidence; this ruling left no basis of liability against Brinkman personally, and he does not appeal.
However, the verdict on the fraud charge, attacked by LDBrinkman Corp. as clearly erroneous, unproven for failure to establish reliance, and based upon non-actionable opinion statements, was left standing; the district court entered, against the holding company, judgment thereon and upon a finding of tortious interference with contractual relations. The defendants’ counterclaim for usury was rejected. The court awarded $332,500 attorneys’ fees under a Texas statute allowing such fee-shifting in contractual recoveries; that award of attorneys’ fees is also challenged by LDBrinkman Corp. on appeal. Gibraltar’s cross-appeal against both LDBrinkman Corp. and Brinkman seeks to reinstate the jury’s finding of “alter ego” liability.
II. Brinkcraft Development, Inc.
Lloyd D. Brinkman now presides over very little of á once-solvent and far-extended Texas business empire that reached throughout the Middle South and Southwest and that once had annual revenues of over a quarter-billion dollars. In addition to a series of unrelated business and financial ventures, Brinkman moved a rather minor floor-covering company into industry prominence, extended it horizontally by the purchase of a manufactured-housing concern, and eventually established a development company to utilize his other businesses’ supplies. This corporation, in turn, expanded into property management and limited partnerships for further real estate development. When the oil-backed economy of the Southwest went sour, the bottom fell out of Brinkman’s realty ventures.
Ignoring the earliest beginnings of Brinkman’s ever-increasing commercial endeavors, the history of the development subsidiaries begins with his buy-out of a modular construction company operated as a sole proprietorship. Ben D. Woody nurtured his mobile home and manufactured-housing business for several years with considerable success. Brinkman acquired all of Woody’s stock in the company in 1978, retaining Woody as president and chairman. In order to identify the manufactured-housing business more closely with his other concerns and thus to strengthen the financial appearance of his fledgling empire, Brinkman renamed the company Brinkcraft, Inc. (BI), and placed it under his holding company, LDBrinkman Corp.
In 1982, BI for the first time ventured into real estate development through a series of limited partnerships. These ventures typically had BI and one Delbert G. McDougal as general partners with, respectively, 50 percent and 25 percent ownership, and Woody as limited partner with the remaining 25 percent ownership. These limited partnerships were managed by McDougal and operated by Brinkcraft Development Co. (BDC), which was wholly-owned by the BI subsidiary established to engage in various development ventures: Brinkcraft Development, Inc. (BDI), which was created to develop properties largely through placement of modular units purchased from BI. Brinkman’s corporate structure for real estate projects thus was:
[[Image here]]
Lloyd D. Brinkman
LDBRINKMAN CORP.
(Kerrville-based holding company)
LDBRINKMAN CO. BRINKCRAFT, INC. (BI) OTHER COMPANIES
(floor covering) (Wichita Falls manufactured housing concern under Woody)
BRINKCRAFT DEVELOPMENT, INC. (BDI) (Lubbock-based modular construction company under McDougal)
*1279 BRINKCRAFT DEVELOPMENT CO. (BDC)
PROPERTY MANAGEMENT LIMITED PARTNERSHIPS OTHER PROJECTS
(BI — 50% owner/gen. p.; McDougal — 25% owner/gen. p.; and Woody — 25% owner/ limited
[[Image here]]
Gibraltar’s $5 million loan to BDI (guaranteed by BI, Woody, and McDougal), which occasioned this suit, was intended to fund existing and planned joint ventures by BDC. Though the holding company had no direct relation with BDI or BDC, McDougal was required to obtain LDBrinkman Corp.’s approval (through the holding company’s chief financial officer) before commencing any BDC development projects. In large part, Woody’s control of BI was similarly circumscribed, though none of LDBrinkman Corp.’s officers occupied any positions at BI, BDI, or BDC.
III. A Roster of the Remaining Players.
Ray Hufhines was BI’s comptroller and chief financial officer, but testified that he took his orders principally from the holding company’s finance personnel. Herb Bradshaw, senior vice president of LDBrinkman Corp., was hired some months before the default on the Gibraltar loan and was one of the prime movers in divesting the holding company of the Brinkcraft subsidiaries (see infra note 47); Gibraltar, indeed, offered proof that he was brought into the company with the thought that he would sell off or otherwise pare back the holding company’s marginal operating subsidiaries. Don Bullock was the holding company’s treasurer, and Thomas Ratcliffe was its chief financial officer; together they ran most of Brink-man’s business operations on a daily basis and were responsible for all but the most important fiscal decisions. Ratcliffe had obtained some $2.5 million for BDI from BancTexas, Dallas (BancTexas), which Brinkman served as a director. (BancTexas had extended to Brinkman sizeable personal and corporate loans and was threatening to call some of these loans during the period in question.)
Ratcliffe desired to have the BancTexas $2.5 million retired through the Gibraltar loan of $5 million; while this was disclosed to the lender, Gibraltar now alleges that other, equally-important, business rationales (of LDBrinkman Corp. and Brinkman, not of the development companies) were undisclosed. CFO Ratcliffe allegedly had enormous input into BDC investment choices and general decisionmaking, and — quite obviously — was involved in the daily operations of both BDI and BDC. (Ratcliffe terminated his employment with LDBrinkman Corp. when the Gibraltar loan went bad, but escaped with a lucrative “consulting” golden parachute.)
Thad Finley, LDBrinkman Corp.’s in-house counsel, sat on the boards of, or was an officer of, most of Brinkman’s businesses. His connection with the instant loan will be explored below. Brinkman’s longtime friend Ivan Irwin, Jr., acted as the holding company’s outside general counsel and also, apparently, actively advised on business decisions. He sat on BI’s board and served Brinkman as particular matters required. Homer Kirby, a lawyer and self-styled workout specialist, is associated with outside counsel Irwin’s law partners and was the person to whom LDBrinkman Corp. transfered BI’s stock; Gibraltar accuses him of plundering the subsidiary’s remaining assets before he filed BI’s bankruptcy.
Frederic Farlow was a long-time friend of, and financier for, Lloyd D. Brinkman; through Farlow, Brinkman, personally and for his various ventures, had obtained some $5-6,000,000 credit from Farlow’s previous employers. Gibraltar Savings’ chief loan executive, James Hollingsworth, hired Far-low as a Gibraltar loan production officer, and thereafter approved Farlow’s (sometimes ambitious) loan recommendations, including the one in question. A self-described “money peddler,” Farlow was an extremely aggressive and eager promoter of both himself and deals he wished to see consummated.
*1280 While both Hollingsworth and Farlow were with Lloyds Bank (the former in California, the latter in Houston), Hollings-worth supervised some of Farlow’s lending activities; Brinkman had obtained two Lloyds Bank loans through Farlow during this period, but Hollingsworth had no contact with these transactions. When Lloyds Bank closed its Houston office, it was natural for Farlow to offer his services to Gibraltar’s new Texas corporate finance head, for whom he had previously worked. It is disputed whether Hollingsworth was, or needed to be, apprised of Farlow’s personal relationship with Brinkman and Rat-cliffe, though he clearly knew that their business contact was extremely friendly, that Farlow sought to service his clients to the benefit of all parties and that Farlow might embellish the merits of a loan he negotiated.
IV. What Farlow Was Told During the Loan Negotiations.
Through Farlow, Ratcliffe sought and obtained a $5 million loan for BDI from Gibraltar. Little else is clear and undisputed. Not only particular acts, statements, or omissions are controverted, but the entire tone of the negotiations could not be more diametrically characterized: In Gibraltar’s view, their new employee acted as virtual agent for Brinkman and LDBrink-man Corp.’s officers, who duped him into a misplaced trust and generally took advantage of their past friendship and amicable business relations and his current desire to consummate several loan deals; according to the defendants, Farlow was an aggressive promoter who went to all lengths to sell them on the loan and whose lax investigation and careless (reckless) lending zeal came back to haunt his new employer.
From the verdict, it is clear that the jury was largely persuaded by Gibraltar’s case; the lender’s evidence was elaborate and far-ranging, and we will not attempt to summarize all of it here. Additional facts that do not neatly fit into the overall puzzle will be described where appropriate. It is fair to say from the evidence, however, that the initial contact came from LDBrink-man Corp.
Whether an informal mention of possible financing from Gibraltar had previously occurred, it is certain that LDBrinkman Corp.’s CFO, Ratcliffe, raised the topic of a new loan with Farlow in August 1984. At this time, Farlow negotiated the transfer of some $4 million of Lloyds loans owed by Brinkman or his companies to Gibraltar; this refinancing was completed before the present negotiations began, and those sums were either repaid when due or were kept current by their respective borrowers. Farlow had also submitted to Lloyds a proposed unsecured loan to finance development of new real estate projects; when Farlow was unable to convince his then employer to accept the deal, Ratcliffe turned to BancTexas. It is this prior similar proposal upon which LDBrinkman Corp. bases its contention that Farlow knew of the need for financing for BDC projects, and that thus it was he who initiated the transaction.
During the discussions concerning his loan request for BDI, Ratcliffe was the sole representative, though he held no position with the ostensible borrower — even as, for a time, one of its four directors, he had not been denominated treasurer or secretary. Neither Woody nor McDougal — nor, indeed, any officer of BI or BDI — took any part in negotiating the Gibraltar loan, and both later guarantors maintain that they knew nothing of Ratcliffe's refinancing plan until presented with the completed loan documents for their signatures. BI’s and BDI’s comptroller also testified that he knew nothing of the Gibraltar loan until after the fact. To reinforce, in the lending officers’ minds, that the holding company was the real party in interest, the sole correspondence regarding the loan was on LDBrinkman Corp. stationery.
During August and September 1984, Rat-cliffe and Farlow negotiated telephonically and in person, and, per Farlow’s later testimony, Ratcliffe made, inter alia, the following representations, which Farlow first passed onto chief Gibraltar loan officer Hollingsworth and, in turn, to Gibraltar’s entire loan committee:
*1281 1. BI’s intercompany debt to LDBrink-man Corp. was $7 million, and BDI’s “outside debt” was solely $2.5 million owed to BancTexas;[3]
2. The Gibraltar $5 million would be used exclusively to repay BDI’s BancTexas debt, with the balance as operating capital to finish BDC’s real estate development projects;
3. LDBrinkman Corp. would subordinate its $7 million in unsecured advances to BI, until the Gibraltar loan was repaid;
4. LDBrinkman Corp. would impose a moratorium on dividend payments from BI to LDBrinkman Corp.; and
5. LDBrinkman Corp. would maintain both BI and BDI as “going concerns” until the Gibraltar loan was repaid.
Based upon Farlow’s repetition of these statements to Hollingsworth and upon the financial information gleaned from LDBrinkman Corp.’s and BI’s annual reports, a Gibraltar credit analyst prepared a “credit request.” This in-house credit request was never circulated to the borrower or those acting for it, but was placed before the bank’s executives; they considered that analysis, a spread-sheet compiled from financial statements and annual reports, along with further financial data. Included in this package were documents provided by Farlow, submitted previously with respect to the Lloyds refinancing showing BDI with almost $4 million in assets and the individual guarantors with more than $4 million combined worth, of which almost $1 million was liquid.
At the time, Woody and McDougal were thought to be taking a one-half interest in BDI but had not been consulted on their willingness to guarantee the contemplated loan. (Woody testified that he resisted the stock transfer and told Ratcliffe on September 6,1984, that he “didn’t want to own a corporation owing $5 million [but] with no assets.” Despite pressure placed on Woody by Brinkman, Ratcliffe, and Finley, the transfer never took place.) No guaranty was sought from LDBrinkman Corp. or Brinkman. Because Ratcliffe was not an officer or director of BDI or BI at the time, LDBrinkman Corp.’s in-house counsel Finley prepared a special corporate resolution for Ratcliffe’s signature authorizing him to sign BI’s guaranty of the BDI note.[4]
The loan documents originally were prepared for BDC, but this was changed to BDI. The lender knew that no financial statements were available for either BDI or BDC, and that BDI was a “shell” without independent assets. (Its corporate checking account seldom had a continuing balance of over $100.) Gibraltar’s loan committee approved the deal during the first week of September. On September 5, Farlow visited LDBrinkman Corp. headquarters in Kerrville to present the loan documents for Lubbock-based BDI. When Farlow again went to Kerrville for the closing on September 14, still no BI or BDI representatives were present. On September 26, the loan proceeds were wired not to BDI in Lubbock, but to BI’s account at its offices in Wichita Falls. Under Ratcliffe’s direct instructions to BI’s comptroller, the loan proceeds were distributed by bank wire as follows: (1) $2,525,000 to BancTex-as; (2) $475,000 on BDI’s account to satisfy *1282 BDI’s line of credit (guaranteed by BI, Woody, and McDougal) from its Lubbock bank; and (3) $2 million to LDBrinkman Corp. in Dallas.
During the loan negotiations, Ratcliffe failed to mention BDI’s additional “outside” debt of almost $1 million, LDBrink-man Corp.’s intention to use proceeds from the Gibraltar loan to retire part of the debt owed BDI’s Lubbock bank, or the possibility of LDBrinkman Corp.’s diverting $2 million to repay part of LDBrinkman Corp.’s advances to BDI. Ratcliffe admitted that he saw BDI “as just a subsidiary that was used to make the loan,” and so he perceived no impropriety in dividing the moneys received as most beneficial to the holding company, regardless of the prior representation that the Gibraltar loan would be used exclusively to retire the BancTexas debt and then to supply BDI and BDC with working capital for their real estate projects.
Ratcliffe also concealed LDBrinkman Corp.’s contemporaneous plan to dispose of the Brinkcraft subsidiaries and to treat them as “discontinued operations” from as early as the spring of 1984, months before the Gibraltar loan was negotiated. Rat-cliffe and Brinkman both testified that the decision to discontinue BI and BDI was not made until November or December 1984,[5] but considerable evidence to the contrary was adduced at trial.
V. The Default.
Gibraltar contends that LDBrinkman Corp.'s diversion of the loan proceeds was but the first link in a chain of acts designed to strip BI of its cash and other readily-sa-leable assets, thus shifting a good part of Brinkman’s loss on the Brinkcraft subsidiaries to their outside creditors. In total, between the time of Gibraltar’s loan (September 26, 1984) and the point at which LDBrinkman Corp. formally wrote the subsidiaries off its books (April 1985), LDBrinkman Corp. took a total of $3,067 million directly from BI in cash and assets, and, additionally, $1.3 million directly from the real estate development partnerships controlled by BDC.[6]
The intercompany advances from LDBrinkman Corp. to BI, which were thus recovered by LDBrinkman Corp., were not evidenced for the most part by promissory notes or other documentation. BI in general, and the development projects in particular, were always undercapitalized, and it was the holding company’s advances that kept the subsidiaries “afloat.”
Woody testified that if BI needed money for a project, “we would call the Kerrville office and they would advance money to us.” Similar ad hoc financing occurred for BDI and BDC. When orders would come to send money back to the parent, BI and BDI obeyed, even if such instructions were contrary to the lines of communication LDBrinkman Corp. itself had established for the movement of “excess funds.” Such transfers were not formally-declared dividends, but were simply intercompany advances flowing in the opposite direction.[7]
*1283 In December 1984, Ratcliffe transmitted BI’s financial statement to Republic National Bank, Dallas, without mention of the $5 million Gibraltar loan to BI’s subsidiary BDI, but excused that violation of accepted accounting procedures later, “because that debt was in Brinkcraft Development and it was a voting control of Brinkcraft Development and was only temporary. And accounting rules say you do not consolidate that subsidiary.”[8]
This was directly opposite to the prior practice of the holding company and BI with regard to reporting subsidiaries’ finances. While BDI was reported on a “consolidated basis” with BI because it was 100-percent owned by BI, and while similarly wholly-owned BI had previously been consolidated in LDBrinkman Corp.’s financial reporting, Ratcliffe decided to remove BDI from BI’s statement, thus concealing the $5 million debt in BI’s fiscal report.
BI’s comptroller testified that he protested that this financial statement would be false and misleading, even if BI’s “control” of BDI was, indeed, only “temporary”; though 50 percent of the stock was supposed to have been transferred to Woody and McDougal on September 6, 1984 (the day after Farlow visited LDBrinkman Corp. headquarters in Kerrville to present the loan documents for Lubbock-based BDI), this buy-back had fallen through almost four months before Ratcliffe made his questionable accounting decision.
On June 1, 1985, Ratcliffe terminated his employment with LDBrinkman Corp. and went on a three-year, $130,000 annual “consulting contract.” At a June 10 meeting, LDBrinkman Corp.’s senior vice president Herb Bradshaw and Gibraltar’s representatives — Hollingsworth and Farlow — met in Houston to discuss “a problem” with the loan. LDBrinkman Corp. also had present in-house counsel Finley, outside general counsel Ivan Irwin, and treasurer Don Bullock, as well as Woody and McDougal representing the Brinkcraft subsidiaries.
At this meeting, the holding company officers disclosed for the first time (1) that a portion of the loan proceeds had been applied in a manner at variance with what Ratcliffe (now departed) had promised Far-low; (2) that Ratcliffe had instructed BI’s comptroller to “delete” the Gibraltar loan from BI’s financial statements; (3) that neither BI nor BDI had any capacity to repay the loan; and (4) that LDBrinkman Corp. had no intention of continuing its prior financial support for the Brinkcraft subsidiaries, which would allow continued debt service by DEI or BI. Hollingsworth thereupon called the loan under the demand provision of the note.
Negotiations between Gibraltar and the borrower’s guarantors continued, despite the lender’s demand and despite BI’s rapidly-accelerating decline. When a $5.5 million judgment against BI was awarded a construction company for defects in the modular units BI supplied for a Port Aran-sas condominium complex, patience with, and confidence in, the parent-guarantor evaporated. Nonetheless, the lender was repeatedly reassured that more time might see the subsidiary’s loan made good from the sale of other development projects. This was the period, however, during which almost $4.4 million in BI assets was applied by the holding company to repay a majority of LDBrinkman Corp.’s $7 million in past advances to BI.
In September 1985, on advice of its counsel, LDBrinkman Corp. instructed BI not to pay principal or accrued interest on the Gibraltar loan. Prior to that date, LDBrinkman Corp. had funded the interest payments, and in at least one instance made the payment directly. In October 1985, after first changing the name back to something similar to what BI had been called when Woody had owned it, LDBrink-man Corp. transferred all of BI’s stock to *1284 “Dallas businessman” Homer Kirby, a self-styled “work out” expert.
Kirby, who is a lawyer associated with one of LDBrinkman Corp. outside counsel Irwin’s law partners, gave no money, notes, or other consideration for the stock. In his attempts to “salvage LDBrinkcraft from financial ruin,” Kirby conferred upon himself a $7500 monthly salary, and, on one occasion, a $30,000 real estate commission for disposing of some of BI’s property. Kirby filed Chapter 11 proceedings for the company after Gibraltar filed suit in November 1985.
VI. The Suit.
The loan was never repaid, and interest accrued to trial to the tune of $787,226. Gibraltar[9] sued the contractual parties, BI’s successor under Kirby, and individual guarantors McDougal and Woody, as well as LDBrinkman Corp. and Lloyd Brinkman. To avoid forcing Woody and McDougal into personal bankruptcy, and in return for their cooperation, Gibraltar settled their individual liabilities under their guaranties for $1,000,000 and an assignment of their interests in the partnerships. Subsequent, to dismissal of claims against them individually, the settlement sum was negotiated down to $350,000 each, once the assigned joint ventures met certain agreed-upon financial goals. Once Kirby petitioned for Chapter 11 relief, Gibraltar obtained from the bankruptcy court an agreed judgment of $5 million and $5000 attorneys’ fees.
The only defendants remaining here are Lloyd D. Brinkman and LDBrinkman Corp. While the original and amended complaints listed other parties, Gibraltar’s third amended complaint alleged that LDBrink-man Corp. and Brinkman were liable as the Brinkcraft subsidiaries’ “alter egos” and for RICO[10] violations, common-law fraud, and tortious interference with contractual relations. This final amendment also removed an interest claim against LDBrink-man Corp. that would have supported a charge of usury by Gibraltar under Texas law and on the basis of which the defendants counterclaimed.
The jury found two of Ratcliffe’s statements to have fraudulently induced the loan to BDI. Awarding no separate damages, the jury also found LDBrinkman Corp. to have tortiously interfered with the contractual obligations of BDI to the lender. The jury made four further findings that BI was the “alter ego” of BDI, that LDBrinkman Corp. was the “alter ego” of both BDI and BI, and that the holding company was, in turn, the “alter ego” of Brinkman. Gibraltar’s other claims were rejected. The verdict was $6 million.
On motions for judgment notwithstanding the verdict, the trial judge disregarded the “alter ego” finding as unsupported by the evidence because, (1) with respect to Brinkman, LDBrinkman Corp. had not been shown to be incapable of meeting any judgment against it, and (2) with respect to LDBrinkman Corp., use of BI and BDI as “shells” did not necessitate “alter ego” liability, since there was liability for Rat-cliffe’s fraudulent representations. We affirm the judgment notwithstanding the verdict, but upon slightly different grounds.
VII. Disregarding BDI and BI’s Corporate Existence.
A. Standing To Bring the “Alter Ego” Claim?
As LDBrinkman Corp. states, “The reasons for Gibraltar’s alter ego accusations are transparent”: Brinkman and LDBrink-man Corp. are the only solvent parties. Given the fact that the named borrower is in bankruptcy, the question, then, is how it happened that this litigation was not tried by a bankruptcy court. While the claims which Gibraltar raises are precisely those expected to be raised by the bankruptcy trustee, and while the district court ordered additional claims to be deleted by amend *1285 ment of the complaint under the view that fraudulent transfer claims were property of the debtor’s estate, we cannot agree with the defendants that Gibraltar’s avoidance of the bankruptcy proceeding was improper with respect to the causes of action the district court allowed to go forward.
Brinkman and LDBrinkman Corp. first contend that the lender lacks standing to bring “alter ego” claims because we have previously held that a bankrupt’s creditor cannot bring an “alter ego” claim against third parties in order to avoid the bankruptcy proceeding. The defendants’ argument, in short, is that the United States District Court for the Western District of Texas lacked jurisdiction to hear the “alter ego” claims concerning businesses on the bankruptcy docket of the Northern District of Texas.[11] Prior precedent indeed has prohibited claims — such as Gibraltar’s — apart from a subsidiary’s ongoing bankruptcy, but we find the present situation distinguishable.
The theory denying Gibraltar standing on this issue is that “alter ego” liability against the parent company or owners, if appropriate at all, should be pursued by BDI’s and BI’s bankruptcy trustees for the benefit of all creditors, not just one whose claim is large enough, or its cause great enough, to allow it to assail the alleged “alter egos” in other fora. We have held on several occasions that such “alter ego” claims are the “property of the estate” within the meaning of the Bankruptcy Code. See S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc., 817 F.2d 1142 (5th Cir.1987).[12]
S.I. Acquisition would preclude Gibraltar’s asserting the “alter ego” claims, but for key distinguishing factors. First, Gibraltar sought and obtained leave, over LDBrinkman Corp.’s vigorous objection, in both the bankruptcy proceedings and the court below, to prosecute the third amended complaint, thereby satisfying the notice requirement expressed in S.I. Acquisition. 817 F.2d at 1154 n. 13. See also In re River Hills Apts. Fund, Inc., 813 F.2d 702 (5th Cir.1987). In addition to the initial hearing on whether the case could proceed, the standing issue was unsuccessfully asserted on several occasions at trial, including in the defendants' motion for a directed verdict. These rulings go unappealed.
Second, though they appealed the order lifting the bankruptcy stay, LDBrinkman Corp. voluntarily dismissed its appeal (under the erroneous assumption that the issue was moot).[13] Normally, we would review an order pursuant to 11 U.S.C. § 362(d) lifting an automatic stay under an abuse-of-discretion standard, but we decline to engage in this inquiry because the issue is not properly before us.[14] Nothing in S.I. Acquisition requires an independent evaluation of even potentially meritorious arguments; the power to lift the stay was properly exercised by the bankruptcy judge, and the propriety of that order on the instant facts is not now in question.
A third distinguishing factor also defeats the defendants’ reliance upon the bankruptcy cases: Here it is the alleged “alter ego” *1286 entity itself that challenges the creditor-plaintiff’s attempt to penetrate the corporate veil. In S.I. Acquisition, the bankruptcy trustee sought to prohibit a creditor-plaintiff from pursuing its claim through the trustee’s contempt power. Here, in contrast, the trustee’s leave was obtained.
An extension of S.I. Acquisition in LDBrinkman Corp.’s favor would mean that allegedly liable “alter egos” could escape liability should the trustee for a “shell” corporation which it (the alleged “alter ego”) has thrown into bankruptcy simply choose not to prosecute a potentially meritorious “alter ego” claim. We decline to convert the recognized shield for the debtor’s estate into a shield for potentially liable “alter egos”; should the bankruptcy trustee decline the gauntlet, the veil-piercing sword is available to tort claimants or contract creditors, should they choose to attack in the bankruptcy proceeding or, with the bankruptcy court’s leave, in another forum.
B. Gibraltar’s Legal Theory.
The liability which Gibraltar seeks to impose upon LDBrinkman Corp. and Brinkman is a direct contractual one, as their operation of BI and BDI as “alter egos” for the overall parent holding company and the owner made them, not the “shell” subsidiaries, the real parties to the transaction. While both Gibraltar and LDBrinkman Corp. would characterize the “alter ego” issue as merely a cause of action for a “sham to perpetrate a fraud,” the contractual liability sought is not for LDBrinkman Corp.’s own acts, but as it stands in the shoes of its subsidiaries through which it chose to transact business. See Valdes v. Leisure Resource Group, Inc., 810 F.2d 1345 (5th Cir.1987).
This classic “alter ego” theory is, as correctly perceived by the district court, unsupported by the evidence under the current statement of Texas law on “piercing the corporate veil.” We find, as did the district court, that there was insufficient evidence of lack of separateness to justify a jury finding that LDBrinkman Corp. and Brinkman were the “alter egos” of BI and BDI. We accordingly affirm the judgment notwithstanding the verdict granted by the district court on the defendants’ “alter ego” liability.
The plaintiff cannot switch from one veil-piercing theory to another. As our discussion of Texas law will make clear, the lender’s “sham to perpetrate a fraud” ground for corporate disregard is distinct from the sole ground addressed by the parties below: classic “alter ego” based upon the absence of any legal or factual distinction between the challenged corporate entity and its corporate or individual owner. Gibraltar chose the “alter ego” ground and not the distinct “sham to perpetrate a fraud” ground; the potentially meritorious alternative basis for corporate disregard is foreclosed, even if its factual and legal requirements may have been subsumed under the arguments made. We made absolutely clear in Valdes that an “[ajppellee may not change legal horses midway through this stream” in its pursuit of direct liability of owners of a corporation, the legal separateness of which is to be disregarded. 810 F.2d at 1353 n. 7.
C. The Texas Approach to the Problem of Corporate Disregard.
1. “Alter Ego.”
In summarizing state law on “corporate disregard,” the Texas Supreme Court began its most recent analysis with a general remark, then listed specific grounds previously recognized by caselaw:
We disregard the corporate fiction, even though formalities have been observed and corporate and individual property have been kept separately, when the corporate form has been used as part of a basically unfair device to achieve an inequitable result. Specifically, we disregard the corporate fiction: (1) when the fiction is used as a means of perpetrating fraud; (2) where a corporation is organized and operated as a mere tool or business conduit of another corporation; (3) where the corporate fiction is resorted to as a means of evading an existing legal obli *1287 gation; (4) where the corporate fiction is employed to achieve or perpetrate monopoly; (5) where the corporate fiction is used to circumvent a statute; and (6) where the corporate fiction is relied upon as a protection of crime or to justify wrong.
Castleberry v. Branscum, 721 S.W.2d 270, 271-72 (Tex.1986) (citation and footnotes omitted).[15] We recently explained our bewilderment at some of the nuances of the Castleberry opinion in Pan Eastern Exploration Co. v. Hufo Oils, 855 F.2d 1106, 1131 (5th Cir.1988):
The Castleberry opinion is puzzling. It begins with a most general principle— ‘when the corporate form has been used as part of a basically unfair device to achieve an inequitable result’ — then follows with a laundry list of seven relatively detailed rationales that intertwine and overlap, yet point in various directions. We think we can fairly discern, however, three distinct strands of corporate disregard under Texas law ..., each [with] a different application.
One strand is obviously a classic “alter ego” prong. The phrase “alter ego” is certainly common in legal thought,[16] but it is now a misstatement of Texas law to use “alter ego” as a generic description of “disregarding the corporate fiction.” The parties never objected to this usage in the district court, however, and in fact used it in their appellate briefs.
The first clause of Castleberry’s “laundry list” misleadingly implies that Texas law excludes classic “alter ego,” i.e., “ ‘disregarding’ the corporate existence when there really is no legal or formal separate existence because of complete domination by the owners, co-mingling of funds, flaws in corporate formalities, etc.” Pan Eastern, 855 F.2d at 1131 n. 39. Yet, as the court made clear later in the Castleberry opinion, “alter ego” is one of the grounds of corporate disregard recognized in Texas— specifically, under ground number (2): “[A]lter ego is only one of the bases for disregarding the corporate fiction: ‘where a corporation is organized and operated as a mere tool or business conduit of another corporation.’ ” 721 S.W.2d at 272 (quoting Pacific Am. Gas. Co. v. Miller, 76 S.W.2d 833, 851, (Tex.Civ.App.—Amarillo 1934, writ ref’d)).
Many wholly-owned subsidiaries and closely-held corporations are not factually distinct from their owners. Many are in fact controlled and operated in close concert with the interests of the owners, and do not have a distinct factual existence: separate employees, offices, or properties; consolidated financial reporting and tax returns; and the like. Such conduct is perfectly natural and proper and provides no basis for ignoring legal independence.[17]
The problem arises when such a corporation is not treated as legally distinct; when, in other words, the owners neglect to maintain the formal independence of the corporation as required by law. “Alter *1288 ego’s rationale is: ‘if the shareholders themselves disregard the separation of the corporate enterprise, the law will also disregard it so far as necessary to protect individual and corporate creditors.’ ” Castleberry, 721 S.W.2d at 272 (quoting Ballantine, Corporations § 123 at 294 (1946)). Under Castleberry,
Alter ego applies when there is such a unity between corporation and individual [or parent corporation] that the separateness of the corporation has ceased and holding only the corporation liable would result in an injustice. It is shown from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual [or parent] maintains over the corporation, and whether the corporation has been used for personal [or parental] purposes.
Id. (citations omitted).
Whether sounding in contract or tort, invoking “alter ego” against a corporation may result in a windfall for creditors or tort claimants. In theory, even if the corporation was adequately capitalized, and even if the claimant did not rely upon the financial backing of the corporation’s owners, the claimant is still entitled to recover as a sort of private attorney general. “Alter ego,” therefore, properly focuses upon the relationship between the corporation and its owners and not upon the relationship between the corporation and the claimant-creditor.
Castleberry states the rationale for “alter ego” liability purely in terms of reciprocal fairness, “but clearly the rule is also designed to give incentives to those using the corporate form to obey the state’s laws fully by maintaining corporate formalities, and thus the legal separateness, of the corporation.” Pan Eastern, 855 F.2d at 1132. Owners that fail to maintain full legal formalities cannot expect to enjoy the limited liability that flows from the corporate form. In addition to legal formalities, formal sufficiency includes adequate capital; thus Castleberry’s seventh reason in its laundry list of reasons for corporate disregard —inadequate capitalization — is closely related to “alter ego,” although it also fits comfortably in the third strand of corporate disregard.
Of course, the different species of corporate disregard seldom occur in pure form, so “alter ego” usually will be accompanied by assertions of unfairness to the claimant. But our present purpose is to isolate analytically the strands of the doctrine, and there is nothing in the “alter ego” strand to suggest that anything more is required than the failure of the owners to maintain the corporation as a distinct legal entity.
2. “Illegal Purpose.”
The second strand of corporate disregard relates to the use the corporate form as a technique for avoiding legal limitations upon natural persons or corporations. In Pan Eastern, we termed this the “illegal purpose” strand of corporate disregard:
Looking at the Castleberry list, ‘(5) where the corporate fiction is used to circumvent a statute’ and ‘(4) where the corporate fiction is employed to achieve or perpetrate monopoly’ are directly within this strand, while others overlap somewhat or fit indirectly: ‘(6) where the corporate fiction is relied upon as a protection of crime or to justify wrong’; ‘(3) where the corporate fiction is resorted to as a means of evading an existing legal obligation.’
Id. As with “alter ego” proper, the focus is on the relationship between and among the corporation, its owners, and the laws of the state rather than on the relationship between the claimant and the corporation; and, again, a creditor’s recovery may be a windfall, because the claim may be unrelated to the illegal purpose. Still, it makes sense to refuse to allow owners to limit liability with the corporate form— even from unrelated civil claims — when the corporation is an instrument of illegality.
“Illegal purpose” disregard differs from “alter ego,” however, because it can be used even when all corporate legal formalities have been kept. There are few cases *1289 that illustrate this strand of corporate disregard in any pure form; in practice, the “illegal purpose” rationale is usually an alternative basis in an “alter ego” or “sham to perpetrate fraud” casé.
3. “Sham To Perpetrate a Fraud.”
The third strand traditionally goes under the name “sham to perpetrate fraud,” Pace Corp. v. Jackson, 155 Tex. 179, 190, 284 S.W.2d 340, 351 (1955), or as Castleberry puts it, “(1) when the fiction is used as a means of perpetrating fraud.” 721 S.W.2d at 271. Elements of this strand can be found “(3) where the corporate fiction is resorted to as a means of evading an existing legal obligation” and “(6) where the corporate fiction is relied upon as a protection of crime or to justify wrong.”
The variety of shams is infinite, but many fit this case’s pattern: A closely held corporation owes unwanted obligations, it siphons off corporate revenues, sells off much of the corporate assets, or does other acts to hinder the ongoing business and its ability to pay off its debts.
Id. at 275 (citations omitted). This strand includes, especially for tort claimants, but also for some contract creditors, the concept of inadequate capitalization as a basis for corporate disregard. For the first time, the focus of veil-piercing analysis is on some inequitable result for the claimant, because of abuses of the corporate form.
Castleberry is emphatic that this category allows a corporate disregard in a much broader range of cases than those strictly speaking of fraud; citing Pacific Am. Gas., 76 S.W.2d at 849, the opinion utilizes the term “constructive” fraud, but its reasoning is much broader:
The basis used here to disregard the corporate fiction, a sham to perpetrate a fraud, is separate from alter ego. It is sometimes confused with intentional fraud; however, ‘[njeither fraud nor an intent to defraud need be shown as a prerequisite to disregarding the corporate entity; it is sufficient if recognizing the separate corporate existence would bring about an inequitable result.’
Castleberry, 721 S.W.2d at 272-73 (citations omitted). The court emphasized that this standard for corporate disregard is whether honoring legal independence would result in “inequity” or “injustice”; the purpose “is to prevent use of the corporate entity as a cloak for fraud or illegality or to work an injustice, and that purpose should not be thwarted by adherence to any particular theory of liability.” Id. at 273.
Castleberry specifically holds that the question of injustice or inequity is a question of fact for the jury. The category is further discussed in Pan Eastern:
The only limitation on this broad strand of corporate disregard is that the focus is on injustice or unfairness to the claimant caused by the corporation and its owners. The unfairness must be something greater than the mere failure to recover a full measure of damages; for example, the running of the statute of limitations as to a tort victim who simply sued the wrong related entity is not enough. See Lucas v. Texas Industries, Inc., 696 S.W.2d 372 (Tex.1984). In contract cases (or in any case based on deliberate acts), the inequity frequently comes from reasonable reliance on the financial backing of the owners. Without reliance, the contract claimant cannot avoid the risk of insolvency that it originally accepted as part of the bargain. See, e.g., Bell Oil & Gas Co. v. Allied Chemical Corp., 431 S.W.2d 336 (Tex. 1968); Edwards Co. v. Monogram Industries, 730 F.2d 977 (5th Cir.1984) (en banc).
855 F.2d at 1133 (emphasis in original).
D. Evidentiary Sufficiency for Corporate Disregard Here.
Though Gibraltar and LDBrinkman Corp. would amalgamate the “alter ego” and “sham to perpetrate a fraud” strands of corporate disregard,[18] the district court *1290 submitted to the jury only the former prong under Texas veil-piercing law. The jury instruction on the difficult question of corporate disregard is set forth in the footnote.[19]
We are mindful that such a jury finding, limited thus to the sufficiency of the showing of a lack of separate corporate existence to justify classic “alter ego” liability, “is heavily fact-specific and, as such, is peculiarly within the province” of the factfinder. United States v. Jon-T Chemicals, Inc., 768 F.2d at 694. While the court hears the same evidence, when a jury finds facts and makes conclusions within its province, those determinations must ordinarily be upheld. The trial judge concluded that the jury’s verdict on “alter ego” liability was unsupported because Gibraltar “failed to present any evidence" that BDI was LDBrinkman Corp.’s “alter ego” and “failed to present sufficient evidence” that BI was. We review the district court’s determination contrary to the jury finding with a significant preference for upholding the verdict. See Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc).
Although we set out both sides of key factual disputes, for the sake of brevity we recite the facts from a perspective favorable to Gibraltar, since the jury’s findings in its favor must be upheld unless completely unreasonable. Id. at 374. Our *1291 power to review the “alter ego” verdict is thus limited; such a jury finding must be upheld unless, (1) as a matter of law, the theory was inapposite to the case, or (2) the factual conclusions were such as no reasonable juror could reach. While the first is not the case, because Gibraltar’s complaint alleged facts sufficient to implicate total lack of regard for the Brinkcraft subsidiaries’ corporate independence, we agree with the district court’s determination that LDBrinkman Corp.’s operation of BI and BDI was not proven to be such as would allow a reasonable factfinder (properly instructed) to impose “alter ego” liability.
The sufficiency of the evidence is governed by federal law in a diversity case. Id. at 868-70. We agree with the district court that the record evidence requires a conclusion that the Brinkcraft subsidiaries (1) had their own staff, payroll, accounting department, auditors and attorneys; (2) kept separate books and bank accounts; (3) filed a consolidated federal income tax return separate from the return filed by LDBrinkman Corp.; (4) were managed by separate boards of directors that had overlapping, but not identical, memberships with that of the holding company; and (5) were centrally managed by the officers of LDBrinkman Corp., but had their own officers.
There was some evidence indicating a laxity of corporate minutes and other documentation, but such is not unusual in small corporations; nor is business conducted by non-contemporary declarations of unanimous consent, and by “past-dated” , resolutions or minutes, necessarily indicative of a lack of corporate legal and formal separateness.
Indeed, the fact that such measures were taken indicates that efforts were being made to observe corporate distinctions between parent and subsidiary.[20] We note that at least some of the “past-dated” documents formalizing prior actions were taken well in advance of litigation (either the bankruptcy proceeding or this suit) and so were not all as Gibraltar would characterize them.
That LDBrinkman Corp.’s chief financial officer and in-house counsel provided services for the subsidiaries was neither unusual nor improper; it is indicative of a similar effort to keep operations distinct that measures were taken to formalize actions when such unofficial advise or representation needed to be formalized. The district court thus correctly determined that Gibraltar failed to prove that any of the particular instances in which LDBrink-man Corp. personnel acted on behalf of the Brinkcraft subsidiaries or required acts on their part constituted an abuse of their corporate identity.
BI’s and BDI’s boards were completely ■ distinct from, even if subservient to, LDBrinkman Corp. This would be virtually fatal to any “alter ego” claim, though the opposite — the mere fact of interlocking directorates and officers — could not turn separate corporations into “alter egos.” From all this, it is clear that LDBrinkman Corp. maintained the separate legal and factual existence of the Brinkcraft subsidiaries with much more than “just a piece of paper lying in a file cabinet.” Edwards Co. v. Monogram Indus., Inc., 730 F.2d at 985.
In Lucas v. Texas Indus., Inc., 696 S.W. 2d 372 (Tex.1984), the Texas Supreme Court refused to find that a parent company was the “alter ego” of its subsidiary where enumerated common characteristics did not exist. As applied to the instant facts the catalogued indicia in Lucas provide a convenient summary: (1) that there was not a complete disregard of corporate formalities; (2) that efforts were made to keep minutes and records of intracompany transactions; (3) that complete and separate corporate and financial records were maintained; ,(4) that separate bank accounts were maintained and that property and assets were not indiscriminately commingled; (5) that stockholder and director meetings were held; (6) that officers and *1292 directors were not only not identical, but were not even substantially overlapping; (7) that there were differences in the business activities and offices of the holding company and the Brinkcraft subsidiaries; and (8) that Gibraltar was in no way confused about LDBrinkman Corp.’s formal distance from, and lack of legal liability for, the BDI loan.
Turning to the “mere tool or business conduit” instruction, this was also an attempt to instruct the jury on “alter ego” proper. Castleberry, 721 S.W.2d at 272 (citing Pacific Am. Gas., 76 S.W.2d at 851); Gentry v. Credit Plan Corp., 528 S.W.2d at 573, cited with approval in Castleberry, 721 S.W.2d at 273. The focus of “alter ego” is on the relationship between the corporations whose identities are sought to be collapsed; use of subsidiaries as conduits for business beneficial to a parent or owner does not — alone—establish liability. Ratcliffe’s “admission” that he simply chose BDI to be the instrumentality for securing additional funds for the Brinkman empire is not as decisive as Gibraltar argues.
At all times relevant to this dispute, the Brinkcraft subsidiaries were run as separate and legally distinct corporations. All corporate formalities were maintained. The normal exercise of the rights and powers incident to ownership does not raise an “alter ego” question of whether the corporation was a “mere tool or business conduit” of its owners. There was simply no evidence in this case of any improprieties in the manner in which BDI and its subsidiaries, parent, overall parent, or other affiliates were operated.
With respect to Brinkman’s liability as “alter ego” for LDBrinkman Corp., we must reach the same result. The holding company’s stock was publicly traded; the holding company had some 1700 direct shareholders; appropriate filings were made with the Internal Revenue Service, the Securities and Exchange Commission, and other governmental bodies; regular minutes, board meetings, and like formalities were observed; there was an audit and conflict committee upon which Brinkman did not serve; and it had three outside directors on its board besides the president of a subsidiary and Brinkman. These formalities properly isolated Brinkman from individual liability on a theory of “alter ego” proper.
Absent such a showing of substantial record evidence of both legal and factual lack of separateness, it is clear that there was an insufficient showing to create a material question that BI or BDI was operated in such a fashion as to create classic “alter ego” liability on the part of either LDBrinkman Corp. or Brinkman. Pace Corp. v. Jackson, 155 Tex. at 190, 284 S.W.2d at 351. The “alter ego” issue should not have been submitted to the jury. Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc., 630 F.2d 250, 260 (5th Cir. 1980); Boeing Co., 411 F.2d at 374-75. Accordingly, judgment notwithstanding the .verdict was appropriate.
E. The Third Ground for Corporate Disregard.
Gibraltar makes two arguments to sustain the legally defective “alter ego” theory of its case: first, that before Castleber-ry, Texas veil-piercing law had not categorically distinguished between the classic “alter ego” and “sham to perpetrate a fraud” prongs for corporate disregard; and second, that “conduit” liability (which was charged to the jury) overlaps both “alter ego” and “sham to perpetrate a fraud,” and thus implicitly can establish liability under the latter denomination.
However, Castleberry itself states that the various strands were distinct in prior caselaw and that, while circumstances might support disregard under multiple theories, each must stand by itself, under each individual test. Castleberry also placed “conduit” doctrines squarely and solely as an element of the “alter ego” analysis. 721 S.W.2d at 272 (citing Pacific Am. Gas., 76 S.W.2d 851). Undaunted, however, by the categorical rejection of just these arguments in Valdes, 810 F.2d at 1353 n. 7, Gibraltar emphasizes the jury’s fraud findings and the soiled facts of this case, which we admit put the equities on the lender’s side. The only prop which Gibraltar retains is thus that LDBrinkman Corp.’s entire scheme was fraudulent.
*1293 The “sham to perpetrate a fraud” basis for corporate disregard rests upon the abuse of corporate forms “as part of a basically unfair device to achieve an inequitable result.” Castleberry, 721 S.W.2d at 271. It is evident that LDBrinkman Corp.’s management utilized the Gibraltar loan principally to benefit the holding company and not the Brinkcraft subsidiaries or BDC’s real estate partnerships. A decidedly unequal allocation among parent and subsidiaries of the costs and benefits of the corporate form, or their use to shift the costs and risks of business to outside parties, may justify disregarding corporate identities, even where all the legal formalities have been maintained. See Pan Eastern, 855 F.2d at 1135. It is a fact question whether there existed such a “profound asymmetry in the behavior of the managers of the [parents] and their affiliates, [that] a reasonable juror could conclude that now ‘recognizing the separate corporate existence would bring about an inequitable result.’ ” Id. (quoting Castleberry, 721 S.W.2d at 273).
With respect to Brinkman, Gibraltar contends that he “habitually” utilized his various companies “as his personal credit card for more than $200,000 per year in personal and household expenses,” and in particular looted the Brinkcraft subsidiaries immediately after securing the loan. In Texas, when a corporate officer or other fiduciary is self-serving in his use of corporate rights or property, disregarding the corporate veil may be appropriate. Rose v. Intercontinental Bank, N.A., 705 S.W.2d 752, 755 (Tex.App.—Houston [1st Dist.] 1986, writ ref’d n.r.e.); Tigrett v. Pointer, 580 S.W.2d 375 (Tex.Civ.App.—Dallas 1978, writ ref’d n.r.e.). Again, however, Brinkman’s alleged “self-dealing” abuse of the subsidiaries’ assets fits solely a “sham to perpetrate a fraud” theory, and this question was not squarely presented to the jury; in fact, much of the evidence on both sides of this issue was excluded.[21]
Looking from the bottom up, instead of from the benefit running to the holding company and Brinkman, Gibraltar argues that BDI was, and is, admitted to be a mere shell, and reasonable jurors could have found sufficient evidence that LDBrinkman Corp.’s and Brinkman’s loose and grey division between the subsidiaries, as well as “looting” and “draining” BI and BDI assets, amounted to a “sham to perpetrate a fraud” on Gibraltar. Whether that could have been established to the jury’s satisfaction, the fact is that Gibraltar failed to make out a clearly-presented case that financial manipulations by Brinkman and LDBrinkman Corp. “propped it up” as a mere shell and conduit that allowed the subsidiaries to generate improperly-siphoned profits for a longer period than otherwise would have occurred. The maintenance of BDI’s timely loan payments solely through LDBrinkman Corp. advances (one made directly to the lender), so as to postpone concern over the borrower’s ability to meet the debt service and thus delaying an allegedly inevitable default, also might have evidenced “a sham to perpetrate a fraud”; but such a scheme was not presented to the jury, which, consequently, did not have an opportunity to prevent an “inequitable result.”
Not only is the reliance component (what Gibraltar knew or reasonably believed about BI and its operation of BDI) of such a conclusion a clear question of fact,[22] but Castleberry makes plain that it is a jury question whether there was unfairness or injustice to the creditor-claimant caused by the use of “shell” companies or by the evasion of existing legal obligations. Noting that Gibraltar sought and obtained a chattel lien and the holding company’s *1294 guaranty on the refinancing of Commercial Aviation’s $8 million Lloyds loan, we express no legal opinion as to estoppel or as to whether the failure to seek a guaranty from either LDBrinkman Corp. or Brink-man affects the reliance component which Gibraltar would have faced. We acknowledge, however, Gibraltar’s factual obstacle on the reliance issue.[23] It is obvious that the general corporate structure of Brink-man’s empire was known to Farlow and the members of the loan committee. From the financial information in Gibraltar’s possession, it is also evident that the lender was amply aware that BDI had no individual assets and was operated as a “shell.”
Similarly, we must agree with LDBrink-man Corp. that the issue of repayment of LDBrinkman Corp.’s advances to both BI and BDI from the subsidiaries’ assets would not have assisted Gibraltar in a “sham to perpetrate a fraud” inquiry. There were independent jury findings adverse to Gibraltar with respect to early repayment of intercompany debt while BDI, and in turn BI, were left to default on Gibraltar’s loan. While Gibraltar employs sinister phrases such as “looting,” “siphoning off,” “cannibalizing the last few scraps off the body,” and “tossing the corpse,” these accusations are only a rehashing of the lender’s complaint that LDBrinkman Corp.’s advances to the Brinkcraft subsidiaries should have been judicially subordinated to Gibraltar’s loan.
But the jury found that LDBrinkman Corp. did not agree to subordinate its debt to Gibraltar’s and committed no fraud in this regard. Gibraltar knew of the inter-company debt between the Brinkcraft subsidiaries and LDBrinkman Corp. but failed to protect itself with a subordination agreement from LDBrinkman Corp. Corporate disregard cannot write new terms for a loan. Since LDBrinkman Corp. breached no contract and committed no fraud, Gibraltar cannot use a veil-piercing theory to create a subordination agreement which Gibraltar never sought.
Similarly, Gibraltar complains about the use of the loan proceeds, on the day of the loan, in another attempt to show that repayment of advances from LDBrinkman Corp. defrauded it. However, the jury found that LDBrinkman Corp. did not commit fraud with respect to the use of the loan proceeds. Again, Gibraltar obtained no contractual restrictions on the use of the loan proceeds, and cannot now complain of “misapplication.” Since we cannot term these jury findings clearly erroneous, we hold that any “sham to perpetrate a fraud” would not have been supported by these rejected contentions.
Since Gibraltar did not (1) ask the district court to submit a clear “sham to perpetrate a fraud” count to the jury, (2) submit appropriate jury charges to the court covering this theory, or (3) object (because it omitted this veil-piercing theory) to the special verdict form which the judge used, Gibraltar does not enjoy the right to retry its corporate disregard case on this theory now. Simply submitting its own substitute form of special interrogatories does not *1295 entitle Gibraltar to a second crack at veil-piercing, and it is beyond our province to rule upon this alternate ground for corporate disregard, which Gibraltar simply failed adequately to put before the jury.
Because of this holding, we decline to reach Brinkman’s contention that so long as LDBrinkman Corp. has assets to meet a judgment against it, there is no basis to pierce the veil to establish personal liability on his part. The Texas cases upon which he and the district court relied may indeed inoculate him from the burden of the jury determination, so long as LDBrinkman Corp. was able to satisfy Gibraltar Savings’ recovery. See Lucas v. Texas Indus., Inc., 696 S.W.2d at 375; Hanson Southwest Corp. v. Dal-Mac Constr. Co., 554 S.W.2d at 718.
VIII. Attorneys’ Fees.
Recognizing that neither Brinkman nor LDBrinkman Corp. stood, absent “alter ego” liability, in privity to the lender, the trial court nonetheless held that the fraud recovery “sounded in contract.” Based upon Milton v. Aransas Shrimp Coop., 668 S.W.2d 735 (Tex.App.—Corpus Christi 1984, error dism’d), and Collin County Sav. & Loan v. Miller Lumber Co., 653 S.W.2d 114 (Tex.App.—Dallas 1983, no writ), the district court granted an amended fee award of $332,500. We reverse the award of attorneys’ fees.
If we were to uphold the “alter ego” finding, LDBrinkman Corp. might be liable for attorneys’ fees as if it were a contractual maker or guarantor of the note. Tex. Civ.Prac. & Rem.Code § 38.001 (Vernon’s Supp.1987). Because such liability was not established, we express no opinion on whether disregard alone would activate section 38.001 and entitle Gibraltar to attorneys’ fees. We also decline at this juncture to address the “presentment” question and other alleged bars to an attorneys’ fees award which the defendants assert.
The claims directly against LDBrinkman Corp. and Brinkman (fraud in the inducement and tortious interference with contractual relations) “sound in contract,” and so the lender contends that fee-shifting may be appropriate on the fraud claims alone. There is admittedly no requirement in the statute (or its predecessor, Tex.Rev.Civ.Stat. art. 2226, repealed eff. Sept. 1, 1985), that the action be for enforcement of an oral or written contract, or even that it be against a contracting party. It is sufficient if the action arises out of a relationship contractual in nature or essentially “one sounding in contract.” Milton, 668 S.W.2d at 737; Alaimo v. Woodlands Nat’l Bank, 698 S.W.2d 234 (Tex.App.—Beaumont 1985, no writ); Higgins v. Smith, 722 S.W.2d 825 (Tex.App.—Houston [14th Dist.] 1987, no writ).
Gibraltar argues that its suit is founded upon written contractual agreements, i.e., the note and the various guaranties, and accordingly that its suit is one that sounds in contract; therefore, it argues that LDBrinkman Corp.’s fraudulent representations made to induce the loan “sound in contract” and that hence attorneys’ fees are recoverable. The fraud “exception” has never been extended beyond suits between parties bound by a contract, however, and we decline to apply the statute to a third party not in privity, simply upon an allegation (even when proven to the satisfaction of a jury) that that third party tortiously interfered with the contract or fraudulently induced it. See Marcus, Stowell & Beye Gov’t Sec., Inc. v. Jefferson Inv. Corp., 797 F.2d 227, 233-34 (5th Cir. 1986); Neeley v. Bankers Trust Co., 757 F.2d 621, 633-34 (5th Cir.1985).
IX. Usury.
In its first and second amended complaints, Gibraltar prayed to “recover from the Defendants jointly and severally ... for the liquidated sum of $5,000,000.00 plus interest as provided in the Note herein described.” In its third amended complaint, that prayer was dropped. Because Texas cases hold that amendment of a pleading does not cure a usurious interest charge created by the filing of an earlier pleading and does not relieve a lender from liability under the statute, the defendants cross-claimed that Gibraltar “charged” interest against them in violation of Texas’ *1296 usury statute. Tex.Rev.Civ.Stat.Ann. art. 5069-1.06.[24]
Assuming that the usury counterclaim based upon the superseded pleadings of Gibraltar was squarely presented,[25] we agree with the district court, however, that the factually-similar case of Fibergrate Corp. v. Research-Cottrell, Inc., 481 F.Supp. 570 (N.D.Tex.1979), is fully disposi-tive of the defendants’ usury counterclaim. There, the defendant’s motion for summary judgment was predicated upon an allegedly impermissible request for interest contained in the plaintiff’s damage prayer. In denying defendant’s motion, then District Judge Higginbotham observed,
A permissible construction of [the usury provision] is that a creditor seeking to recover interest as damages is not making a ‘charge’ of interest. The interest claim is not rooted in a free contractual relationship between two private parties, but is an element of nonconsensual damages.
Id. at 572. While later state cases arguably are at variance with the outcome of Fibergrate, nothing has directly impeached its authority, and we find its reasoning persuasive.[26]
The initial two complaints were against more defendants than the two remaining here. Gibraltar may have inartfully drafted its prayer for relief, but the interest claimed was clearly proper against those who were contractually bound to pay the note. The district court chose to read the first and second complaints as seeking the interest eo nomine solely from BDI and the guarantors.[27] Against these parties, the district court entered judgment in granting the motion for summary judgment. After this judgment, Gibraltar amended its complaint to remove the prayer for contractual interest.[28]
*1297 None of the cases cited by the defendants approaches the facts here. There was no underlying usury, as necessary under the reasoning of Justice Gonzalez’s Dan-ziger concurrence. We also cannot say that clear error is presented by the district court’s reading of the first and second complaints as (impliedly) limited to the borrower and guarantors — thus presenting LDBrinkman Corp. no usury claim at all. Indeed, one unique circumstance amply distinguishes defendants’ cited authority: Had the “alter ego” finding not been vacated by the district judge, then defendants would have been held to have contracted for the interest; Gibraltar’s original prayer for relief would thus have been proper against them as well as against BDI and BI and the individual guarantors.
X. The Other Findings.
We now turn to the jury findings of LDBrinkman Corp.’s tortious interference with the contractual relations between Gibraltar and LDBrinkman Corp.’s Brinkcraft subsidiaries and of fraud in two of Rat-cliffe’s representations to Farlow. For reasons that will be explained, the judgment on the first fraud count cannot stand, but we uphold that portion of the verdict that was based upon the second fraud finding and the finding of tortious interference with business relations. We also hold that the amount of damages was erroneously determined and must be adjusted.
A. Sufficiency of the Evidence.
In reviewing the sufficiency of the evidence to support the jury verdict, a court of appeals must consider all of the evidence, drawing all reasonable inferences in favor of the prevailing party. Quinn v. Southwest Wood Products, Inc., 597 F.2d 1018 (5th Cir.1979). The appeals court is not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different conclusions or because the court feels other results would have been more reasonable.[29] Weighing the conflicting evidence and the inferences to be drawn from that evidence, and determining the relative credibility of the witnesses, are the province of the jury, and its decision must be accepted if the record contains any competent and substantial evidence tending fairly to support the verdict. Dartez v. Fibreboard Corp., 765 F.2d 456 (5th Cir.1985).
Substantial evidence, while something less than the weight of the evidence, is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, even if different conclusions also might be supported by the evidence. Refrigerated Transp. Co. v. ICC, 663 F.2d 528 (5th Cir. Unit B Dec. 1981); Solis v. Rio Grande City Indep. School Dist., 734 F.2d 243 (5th Cir.1984). Under this standard, it is not the function of the appeals court to reverse merely if it believes the evidence might have supported a different verdict. If there is an evidentiary basis upon which the verdict can be supported, the jury’s determinations will be left undisturbed, even where there is substantial contradictory evidence that could have supported an opposite verdict.[30] “We decide only if reasonable jurors could agree with *1298 this verdict.” Texoma AG-Products, Inc. v. Hartford Acc. & Indem. Co., 755 F.2d 445, 448 (5th Cir.1985).
B. Tortious Interference with Contractual Relations.
The jury found that LDBrinkman Corp.’s officers tortiously interfered with BDI and BI’s obligations under the loan and the parent’s guaranty. Gibraltar did not emphasize this claim at trial, and neither side adequately briefed the issue on appeal. We conclude, however, that this jury finding was supported by the evidence, and that judgment — in an amount as will be discussed — on this verdict is appropriate.
Texas law on a third party’s wrongful interference with contractual obligations is well-developed, and we have often been called upon to interpret it.[31] Under Texas common law, the elements of a cause of action for tortious interference with contractual relations are: (1) a contract; (2) an intentional and wilful act, interfering with the contract, that was calculated to cause damage to the plaintiff; (3) the lack of any legally justifiable cause or excuse on the part of the defendant; and (4) actual damages.[32] The court’s charge thoroughly explained these elements and specifically emphasized excuse or privilege, which had been argued to defeat the cause of action in unsuccessful motions for summary judgment and directed verdict.[33]
The jury finding that LDBrinkman Corp. wrongfully interfered with BDI’s contractual obligation under the note provides ample support for the verdict, even if the jury found no separate damages for this interference. The finding that Gibraltar sustained no damage is inconsistent with the finding of interference. However, inconsistent jury responses require a remand for a new trial only if the answers are irreconcilable. Willard v. The John Hayward, 577 F.2d 1009 (5th Cir.1978). Evidently, the jury intended to avoid a “double recovery,” and if the verdict is to be given effect, the judgment may be sustained on this alternate ground. See Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773, 781 (5th Cir.1986), cert. denied, 481 U.S. 1015, 107 S.Ct. 1892, 95 L.Ed.2d 449 (1987).
C. Fraud.
Under Texas law, a plaintiff may recover for fraud upon establishing that (1) the defendant made a false material representation consisting of either a positive untrue statement of material fact, the concealment of a material fact, or nondisclosure of a material fact which he had a duty to disclose; (2) the defendant knew the material representation was false or made it recklessly without any knowledge of its truth; (3) he made the representation with the intent that it should be acted upon by the plaintiff; (4) the plaintiff acted in reliance upon the representation; and (5) the *1299 plaintiff suffered injury.[34] In Texas a plaintiff may recover for fraudulent inducement to enter a contract based upon either misrepresentation of a past or existing fact (“false statement”) or the intentional tort of “false promise,”[35] which requires proof of an intention not to perform at the time the representation was made. Fredonia Broadcasting Corp. v. RCA Corp., 569 F.2d 251, 258 (5th Cir.), cert. denied, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978).[36]
Five alleged misrepresentations made by Ratcliffe to Farlow were presented to the jury; only two were found to have constituted fraud (broadly defined in the instructions). The answers to interrogatories set forth in the footnote constituted the jury’s acceptance of proof with regard to the various representations which Gibraltar claimed fraudulently induced it to issue the loan to BDI.[37]
1. Understatement of BDI’s Total

Debt.

The defendants have highlighted a major problem with the first fraud count with respect to the finding of fraud in Ratcliffe’s representations of BDI’s financial situation and the amount of its outside debt.[38] The pretrial order and the special interrogatory submitted to the jury addressed only the misrepresentation of total existing debt of Brinkcraft, Inc. Gibraltar acknowledges that the interrogatory should have referred to Brinkcraft Development, Inc.’s total debt. The issue becomes not whether there was ample evidence, but whether the jury was misled by the incorrect wording of the verdict form.
Gibraltar believes that the jury was not misled, first, because Gibraltar never contended that Ratcliffe represented that the outside debt of BI was only $2.5 million;[39] *1300 rather, he represented to Farlow that the outside debt of BDI did not exceed that amount. Second, Gibraltar argues that the verdict can be harmonized with the judgment; analogizing to the situation in which there are apparent conflicts between answers in a jury verdict, Gibraltar suggests that the question is whether the answer may fairly be said to represent a logical and probable decision on the issue as submitted, although the form of the issue or alternative selective answers prescribed by the court may have been the probable cause of the difficulty and produced the apparent conflict.[40]
We cannot say, based upon our review of the record, that the jury was clearly not misled. Given the volume of evidence and testimony regarding multiple, overlapping businesses with similar names (referred to differently by different parties and witnesses) and about which at least two witnesses themselves misspoke,[41] the most attentive, careful, and clear-minded jurors might well have been confused regarding certain details.
But more is at stake in the misidentification of BDI’s total indebtedness than simply whether the jury, overall, was misled. Because the pretrial order also contained the misnomer, Gibraltar should have been limited to evidence of fraud in BI’s financial disclosures. While we can accept that the omission of the word “Development” in the relevant section of the pretrial order was merely an inadvertent oversight or typographical omission, we must hold that the pretrial order allowed proof only on a claim against BI.[42]
2. Planned Dissolution.
While vague statements regarding the future financial prospects of a commercial concern are nonactionable opinion or future speculation,[43] it is well settled in Texas that a promise to do an act in the future is actionable as fraud where it is made with the purpose to deceive and without any intention of performing the promised act.[44] Beyond the falsity, reasonable reliance, and other elements of an ordinary fraud action, “false promise” requires proof of an intention not to perform at the time the representation was made. Fredo-nia Broadcasting Corp. v. RCA Corp., 569 F.2d at 258.
The jury was properly instructed on the elements required of both the “false statement” and “false promise” strands of Texas fraud law. Indeed, the defendants did not object to, and do not now challenge, the jury instructions on this issue. Contending that “[t]he events that destroyed the company — the downturn in the Texas economy and the $5[.5] million judgment from the construction lawsuit — occurred much later,” the defendants obscure the fact that Gibraltar’s “ongoing and successful” count focused not upon predictions of the Brink-craft subsidiaries’ anticipated profits, but *1301 upon its owners’ concluded decision to divest the holding company of a subsidiary already viewed as “unprofitable” prior to Gibraltar’s loan.[45] The debate thus is over the characterization of Ratcliffe’s representations that the Brinkcraft subsidiaries were “ongoing and successful” and that LDBrinkman Corp. would continue to finance them so long as Gibraltar’s loan was outstanding.
LDBrinkman Corp. would have us hold, as a matter of law, that such a statement was an ambiguous personal opinion at best, upon which no reliance could be reasonably placed and which, again as a matter of law, is not actionable under Texas law. Gibraltar, on the other hand, contends that the remarks were misstatements “both of existing fact and which in the context of this case, constituted a secret intention not to perform.” Thus, as to a false representation of fact regarding the future performance of an act, Gibraltar’s argument is that Ratcliffe’s “promise” to fund BDI at least for the term of the loan “was clearly intended to mean and be perceived by [] Farlow that LDB[rinkman Corp.] would continue its financial support of the subsidiaries until the loan was repaid.”
At several stages in the trial, Gibraltar’s witnesses categorically declared that the loan would not have been issued but for the assurances that the Brinkcraft subsidiaries would remain as LDBrinkman Corp. operating units with the full backing of the holding company. Most importantly, Far-low extensively evaluated his discussions with both CFO Ratcliffe and in-house counsel Finley; he reiterated on several occasions his contemporary interpretation of the representations and how he related them to Hollingsworth.[46]
Given that the jury was properly instructed, the verdict evinces the jury’s acceptance of Farlow’s testimony. Its application of the facts under the law, as properly presented to it, was that these representations were not mere expressions of opinion or speculation of future profitability or other events, but rather were unambiguous declarations of positive fact secretly contradicted by prior LDBrinkman Corp. actions, or were a false assurance of a future course of LDBrinkman Corp.’s conduct, the performance of which had already been determined to the contrary.
The evidence was overwhelming that LDBrinkman Corp. had made the decision, prior to negotiating the loan, that it intended to sell or dispose of BI.[47] Yet it permit *1302 ted Ratcliffe to represent that both BI and BDI were ongoing and would be allowed to operate, grow, and successfully repay their outside liabilities, knowing that Gibraltar would rely upon LDBrinkman Corp.’s promise to keep the subsidiary viable until the loan was repaid. This satisfies the requirement that the “false promises” be reckless or with knowledge of their falsity.[48] While a representation regarding the “ongoing” nature of subsidiaries which a parent corporation is selling to the subsidiaries’ officers would not necessarily be false, in the context of this case these representations were hardly “ambiguous expressions of opinion” as suggested by LDBrinkman Corp.[49]
Thus, we reject the defendants’ legal contention that the “ongoing and successful” statements were merely expressions of opinion and not promises as to existing facts required to impose liability for fraudulent inducement to contract. That Rat-cliffe “promised” continued financial backing by the holding company is as apt a characterization of the questioned remarks as that they were, and were intended to be, personal opinions about future profitability and fiscal health. The materiality of such financing is undisputed, and that Gibraltar made inquiries of this nature and expressed concern over the holding company’s intentions was testified to by both Hollingsworth and Farlow. Inferences reasonably drawn from these facts lead us to conclude that — in context — Ratcliffe’s representations were not merely non-actionable statements of opinion. See Valdes, 810 F.2d at 1350.
It is also completely unavailing to argue that Farlow, if not others at Gibraltar, knew of the management buy-back that was contemplated for BDI, and that that reasonably should have put the lender on notice that LDBrinkman Corp. might otherwise dispose of or close down the operating subsidiaries. The interest which Woody and McDougal contemplated acquiring would have still left LDBrinkman Corp. with a controlling interest in the Brinkcraft subsidiaries and in each of the limited partnerships.
Furthermore, BI was a general partner and one-half owner in each of BDC’s limited partnerships. Brinkman was a limited partner in some of those real estate projects. Additionally, he served as chairman of BDI and had a strong influence on BI. In the context in which Ratcliffe’s representations were made, it would not be expected that LDBrinkman Corp. was going to cut the additional ties with the subsidiaries, even if Woody’s buy-back had occurred. It was reasonable for the jury to find either that it was fraudulent not to disclose the concluded plans to divest the *1303 Brinkeraft subsidiaries or that the assurance was a false promise that LDBrinkman Corp. would maintain its interest in them, either through continued control after the Woody-McDougal buy-back or otherwise.
Because of a supposed lack of sufficient record evidence on an essential element of fraud, LDBrinkman Corp. contends that there was no proof of reliance, even if we hold that Gibraltar could reasonably rely upon Ratcliffe’s statements. The heart of this contention has two prongs: (1) that what little reliance testimony that was heard all concerned the supposed oral “subordination” agreement, and (2) that Farlow, from his past dealings with Brinkman’s business empire and from the documents submitted by Ratcliffe, knew or should have known how the “shell” corporations and their cash surpluses were routinely utilized as momentarily most opportune for the holding company.
While there was ample proof of LDBrinkman Corp.’s lack of intention to perform in order to substantiate a “false promise” theory, no fraud claim could succeed without separate evidence of reliance.[50] Although reliance might seem almost unreasonable on the part of careful and considered lending officers, Farlow’s testimony and that of other Gibraltar employees, to the effect that the loan would not have been made but for the “ongoing and successful” representation, constitutes proof of actual reliance on Gibraltar’s part.
The defendants also argue that the data contained in the financial statements and annual reports reviewed by Gibraltar employees in the course of preparing the credit request and the spread sheets “negate justifiable reliance.” However, while knowledge of facts that would lead a reasonably prudent person to conduct further inquiry to clarify a misimpression or reveal a misrepresentation can be deemed equivalent to knowledge of the truth,[51] we cannot agree that the interpretation of corporate records and divination of LDBrinkman Corp.’s and Brinkman’s business intentions are tantamount to circumstances in which the plaintiff’s possession of the defendant’s accurate internal documents might foreclose a later claim that fraudulent statements misled the plaintiff and contradicted those documents.
We also cannot overlook this unequivocal evidence of Gibraltar’s reliance upon the “ongoing and successful” assurances of continued funding, even though it is true that the thrust of Gibraltar’s trial efforts on the five fraud claims, and most of the reliance testimony, concerned Ratcliffe’s alleged representations regarding subordination and regarding divided payments (i.e., the third and fourth of the five alleged misrepresentations). It is true that the jury found no fraud in Ratcliffe’s alleged promises that LDBrinkman Corp. would impose a moratorium on repayment of its advances to BI until Gibraltar was repaid, and would, in effect, subordinate the subsidiary’s $7 million intercompany debt to the sum which BI contingently owed Gibraltar on the guaranty of the BDI loan. However, the jury’s rejection of claims that those statements constituted fraud does not impugn its acceptance of other counts that are adequately supported in the record with respect to all essential elements of liability. Although the direct argumentation and proof of actual reliance could have been stronger, this is no more true with respect to the “ongoing and successful” count than with respect to the “subordination” counts.
*1304 We hesitate to overturn a verdict where the instruction was clear and unambiguous,[52] and we must agree that there was sufficient evidence to support the jury’s finding of reliance. We disagree entirely with defendants’ vehement contention that Gibraltar could not have relied as a matter of law. While the defendants’ evidence of Farlow’s zeal in pursuit of this loan, of his close association with both Brinkman and Ratcliffe, and that he was told more regarding the planned divestiture than what he admitted is all persuasive in comparison to the bare assertions of Gibraltar employees after the fact, such credibility choices are the jury’s, not ours; we refuse to substitute our reading of the evidence for that of a factfinder.[53] While we find the contradictory evidence and inferences persuasive, they are not so compelling as to allow us to supplant the jury’s determination.[54]
D. Proof of Damages.
LDBrinkman Corp.’s argument that Gibraltar failed to prove its damages is predicated on the contention that this was a “secured” loan. However, the loan was absolutely denominated an “unsecured working capital loan.” The Woody, McDougal, and BI guaranties were not “security” [55] in the sense that a collateral pledge of the development partnerships’ real property would have been.
LDBrinkman Corp. argues that Gibraltar had to continue to pursue McDougal and Woody, even though they did not participate in the loan negotiations and had no control over the disbursement of the loan proceeds or the use of the subsidiaries’ assets. While Texas law requires that the principal be joined in a suit against the guarantor unless the principal is “notoriously insolvent,”[56] the defendants cite no authority for their argued corollary rule, *1305 that the creditor must sue each guarantor. Gibraltar properly and legally compromised with the individual guarantors rather than force them into personal bankruptcy, and in no way thereby compromised claims against coguarantor BI or against the parent and owner under separate causes of action.[57]
The Texas authorities cited by LDBrink-man Corp. are securities cases without direct application to a case such as this.[58] LDBrinkman Corp.’s arguments based upon the law of fraudulent securities transactions is misplaced, because the straight loan of money without expectation of participating in the profits of the venture, as here, does not implicate the out-of-pocket limit on damages appropriate in actions under the securities laws.[59]
LDBrinkman Corp. also complains that the award' of $6 million has no foundation in the evidence. It is quite apparent that in assessing Gibraltar’s damages, the jury took into account not only the $5.0 million loan proceeds, but also the reasonable value of the use or detention of those funds through the time of trial. While the remaining defendants were not legally obligated for interest, equity might entitle the lender to such an amount as part of its damages.
Under several cases from the Texas state courts and federal courts construing Texas law, it has been held that an award of prejudgment interest is permitted under general principles of equity.[60] Gibraltar would have been entitled to equitable prejudgment interest, which would have been assessed by the court in entering judgment upon the verdict. The jury knew that the interest accrued and unpaid to the time of trial was $787,226. However, the jury apparently selected a rate that equated to an amount somewhat greater than the rate provided in the note; this error must be reformed by the district court to reflect the correct amount of prejudgment interest which Texas law allows.
Adjustment in accordance with actual damages also appears to be appropriate, because the district court apparently did not provide a credit for any sums actually received by Gibraltar from the settlements with Woody and McDougal and the agreed judgment against BI. Thus, on remand the district court should reduce the judgment by the amounts, if any, which Gibraltar has been paid by Woody, McDougal, and/or BDI, BI, and their successors.[61] We remand for this limited purpose only.
*1306 XI. Conclusion.
In summary, the district court correctly entered judgment in favor of Gibraltar and against LDBrinkman Corporation for $5,000,000, representing the principal amount due on the Gibraltar note. from BDI. This recovery is subject to reduction for sums actually received by Gibraltar from McDougal and Woody on their settlement with Gibraltar and from BDI, BI,. and their successors in favor of Gibraltar. On remand, the district court will determine what sums Gibraltar has received from these sources and reduce Gibraltar’s judgment accordingly. Gibraltar’s recovery so computed shall be increased to reflect an appropriate amount of prejudgment interest.
We also affirm the district court’s dismissal of Gibraltar’s action against L.D. Brink-man individually, because we conclude that the district court correctly granted judgment notwithstanding the verdict on the jury findings accepting Gibraltar’s “alter ego” theory of recovery against LDBrink-man Corp. and Brinkman individually. Because of our determination that the “alter ego” findings were Gibraltar’s only predicate for recovery of attorneys’ fees, our conclusion that the district court correctly set aside these jury findings also requires us to reverse the district court's award of attorneys’ fees to Gibraltar. Accordingly, the judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

. The borrower’s president and chairman, Ben D. Woody, has settled his personal guaranty on the note for $350,000. Delbert G. McDougal, the other general partner in these real estate development joint ventures, who also guaranteed Gibraltar's $5 million loan, has settled as well with the lender for $350,000.

. LDBrinkman Corp. acted as Brinkman’s holding company for: a chain of pizzarias; LDBrinkman Co., a .very large floor-covering distributor with sizeable business debt; a company called Commercial Aviation, which also had obtained over $3,000,000 in loans; and Brinkcraft, Inc. (BI), a recently-acquired mobile home manufacturer, which was the sole owner of the entity to which Gibraltar extended its loan. Brinkman allowed the former BI owner Ben D. Woody — retained as president and chairman, but without any ownership interest — to branch it and later-organized subsidiaries into real estate development limited partnerships and other fields utilizing BI’s prefabricated structures, LDBrinkman Co.’s floor coverings, and the like.

. Ratcliffe had negotiated the line of credit with BancTexas — which Brinkman served by sitting on its board of directors. That debt was due, and the lender was unwilling to roll it over, though LDBrinkman Corp.’s owner and officers sought such a direct refinancing and attempted to persuade BancTexas that the subsidiary would remain solvent — despite their alleged knowledge that BDI could not meet such an amount in the short term of any contemplated refinancing, and also despite their conclusion that the business’s future was questionable. Brinkman admitted he would not have "felt right” about leaving BDI’s debt to BancTexas unpaid, so Farlow was contacted to obtain a Gibraltar loan to eliminate the BancTexas debt.

. Contrary to the facts recited in that resolution, no board meeting was held, and in the rush of later events, Finley, Ratcliffe, and Brinkman— allegedly "realizing their error” — attempted to "cover its [LDBrinkman Corp.’s] tracks” by creating a conveniently-backdated "unanimous consent” for BI’s directors to sign. Woody protested the date recited in the resolution, refused to participate in the effort to formalize and authorize the prior actions of Ratcliffe, and thus made it clear that his and BI’s approval was not sought until long after the fact. At the same time, Finley prepared another unanimous consent for the directors’ signatures reciting BI’s board’s unanimous consent to the Woody-McDougal buy-back of BDI.

. Brinkman stated that LDBrinkman Corp.’s board of directors made such a year-end decision to discontinue the Brinkcraft subsidiaries, but no corporate minutes were prepared to document this significant decision affecting an important component of LDBrinkman Corp.’s business.

. The $1.3 million figure represented the proceeds from the profitable sales of two of the development projects. In both instances, McDougal testified that he had intended to use those funds to reduce the Gibraltar obligation, but was prevented, under the threat of losing his job, from doing so by express orders (from Brinkman and Ratcliffe on the Sagewood sale and from Herb Bradshaw on the undeveloped Albuquerque land), to send the proceeds directly to the parent company.

.While characterizing Brinkman’s machinations as a “shell game” is inappropriate, it is clear from Woody’s testimony that the ostensibly separate entities were entirely controlled by LDBrinkman Corp. and Ratcliffe and Brink-man. If Brinkman wanted a BDI project discontinued, it was discontinued, without regard to the losses which BI would incur. Brinkman once demanded that BI surrender an aircraft on loan from Commercial Aviation, and though BI complied, it thereafter had to lease one from an unrelated company. Brinkman similarly demanded that BI sell off its division known as Woodco Supply in a partial liquidation of assets, and it was done. When LDBrinkman Corp. decided to change BI's name back to one similar to what Woody had used before the buy-out, Woody, although president of the company and a member of its board of directors. *1283 was not consulted and took no part in the action. When LDBrinkman Corp. demanded that $1 million from the proceeds of a large Albuquerque sale be deposited directly with the parent company, the subsidiary complied. Though having no common officers and only a few overlapping directors, Wichita Falls-based BI had its corporate minutes prepared and kept at LDBrinkman Corp. headquarters in Kerrville.

. LDBrinkman Corp.’s own experts testified that Ratcliffe had no acceptable basis for this "bizarre" interpretation of proper accounting rules.

. The plaintiff here is a California corporation that is unaffiliated with the Texas institution of the same name, and so jurisdiction below was based upon diversity, as well as upon federal questions raised by statutory claims Gibraltar pled.

. Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq.

. In re Lanchart, Inc. d/b/a Lancer Homes, f/d/b/a Brinkcraft, Inc., No. 7-85-70218 (N.D. Tex. filed Nov. 25, 1985) (the BI bankruptcy proceedings).

. See also In re MortgageAmerica, 714 F.2d 1266 (5th Cir.1983); Chicago Florsheim Shoe Store Co. v. Cluett, Peabody & Co., 826 F.2d 725 (7th Cir.1987).

. LDBrinkman Corp. v. Gibraltar Savings (In re Lanchart, Inc.), No. 7-85-70218 (N.D.Tex. filed Nov. 25, 1985), appeal docketed, No. 87-1332 (5th Cir. May 6, 1987), voluntarily dismissed (5th Cir. Sept. 14, 1987).

. When the district court lifted the automatic stay of proceedings, the defendants argued that there was no authority to allow other proceedings to continue. At the time the stay was lifted, the bankrupt borrower and parent-guarantors were named parties to Gibraltar’s action. There are multiple instances in which separate proceedings have been allowed to coincide against a debtor. The defendants cite no cases limiting the discretion of the bankruptcy court to lift a stay allowing a claim such as Gibraltar’s to be tried elsewhere. Expressing no view as to whether the instant exercise of the power to lift the automatic stay was an abuse of discretion, we hold that the defendants cannot succeed on their standing argument, because they voluntarily dismissed their appeal from the district court’s ruling that the bankruptcy judge could lift the stay on this suit.

. In a footnote immediately following this passage, the Court added a seventh ground, which in practice is an indicator of the other grounds, but which we list here for completeness: (7) where the corporation is inadequately capitalized.

. Classic "alter ego" has often been (and still is) used as a generic term for corporate disregard or "veil-piercing,” but the Castleberry opinion makes clear that "alter ego” is a particular kind of rationale for corporate disregard. See Pan Eastern, 855 F.2d at 1130-33; Valdes v. Leisure Resource Group, Inc., 810 F.2d at 1354. The focus of "alter ego” proper is on the legal adequacy of the corporation’s existence, the failure to maintain separate identities between corporate forms, and the relationship between the corporation and its controlling corporate or individual owners. See United States v. Jon-T Chemicals, Inc., 768 F.2d 686, 696 (5th Cir.1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986); Nelson v. Int'l Paint Co., 734 F.2d 1084, 1091-93 (5th Cir.1984).

. Compare Edwards Co. v. Monogram Indus., Inc., 730 F.2d 977 (5th Cir.1984) (en banc) ("shell” subsidiary was formally distinct, and creditor was not misled; corporate disregard under Texas law was therefore improper) with United States v. Jon-T Chemicals, Inc., 768 F.2d at 696 (laundry list of 12 factors forjudging lack of separateness under then-current Texas law). In Valdes, we remarked that
[a]lter ego status is tautological with actual control of the subservient entity. Unrestricted ownership of that entity provides a logical backdrop for domination, although ownership alone will not support an alter ego finding.
810 F.2d at 1354 (citing Gentry v. Credit Plan Corp., 528 S.W.2d 571, 573 (Tex. 1975)).

. Only Brinkman’s brief clearly delineates that Gibraltar’s contentions go not to an "alter ego” theory, but to a “sham to perpetrate a fraud.’’

. The instruction reads as follows:
Gibraltar also contends that Brinkcraft Development, Inc. and Brinkcraft, Inc. were the alter egos of LDBrinkman Corporation and that LDBrinkman Corporation is the alter ego of Lloyd Brinkman. The general rule is that corporations and shareholders are separate and distinct and that the liability of one cannot be imposed on the other; however, the existence of a corporate entity may be disregarded where it is proved that the corporation was created as a mere device or sham to accomplish some ulterior purpose or as a mere instrumentality or agent of another corporation or individual owning all or most of its stock, or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose.
In order to pierce the corporate veil under the theory that a corporation is the alter ego of its shareholder, the Plaintiff, in this case Gibraltar, must prove both, one, that the separateness of the corporation and the shareholder has ceased to exist and, two, that upholding the separate corporate existence, would, under the circumstances, sanction fraud or promote injustice.
Where one is the principal stockholder of one or more corporations and personally conducts their business or manages their assets, he may be found individually liable for the corporate obligations if it is proved that he has consistently engaged in a course of conduct by which he has ignored the existence of the corporate entity or entities and has, in fact, conducted business as an individual by exercising such paramount and personal control over the operations of the corporation or corporations that their corporate existence has been disregarded and their business interests and his own personal interests cannot be reasonably separated.
You are further instructed that majority or total ownership of all the stock in a corporation or mere control by the shareholder of a corporation does not mean that the corporation is the alter ego of its shareholders. Gibraltar must show by a preponderance of the evidence that the absence of separateness between the parent and the subsidiary is so complete and that the two are so intertwined that the subsidiary is nothing but a name or a conduit through which the parent conducts its own business. There must be a showing that for all practical purposes the subsidiary existed in name only and that there was virtually total disregard by the parent of the subsidiary’s separate existence.
You are further instructed that a subsidiary corporation may become the alter ego of its parent corporation when the parent corporation totally dominates and controls the subsidiary as its agent or business conduit.
You are instructed that the question of alter ego does not turn upon any one fact. In making this determination, you may consider whether the parent and subsidiary have common stock ownership. Parent and subsidiary have common business deposits. Parent and subsidiary file consolidated financial statements and tax returns. Parent finances the subsidiary. Parent causes the incorporation of the subsidiary. Subsidiary operates with grossly inadequate capital. Parent pays the salaries and other expenses of the subsidiary. Parent uses the subsidiary’s property as its own. The subsidiary does not observe the basic corporate formalities such as keeping separate books and records and holding in [sic] shareholder and board meetings. A subsidiary does not become the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to the stockholder. [Emphasis added.]

. In order to authorize the Woody-McDougal buy-back of BDI, LDBrinkman Corp. in-house counsel Finley prepared yet another "Certificate of Corporate Resolutions” for BI’s board — reciting the "unanimous” consent of BI’s directors to the transfer of 50% of BDI’s stock to the subsidiaries’ management.

. The court allowed only limited testimony regarding Brinkman’s conduct with respect to dividends, annual bonuses, and the like. While his "conspicuous consumption" was documented to some extent, this evidence was itself curtailed because the judge viewed it as without "a frazzling thing to do with this lawsuit”; similarly, whether he reimbursed advances, or they were offset against his annual bonus, or whether he paid interest thereon, and was suppressed for the most part.

. Rose, 705 S.W.2d at 755; Atomic Fuel Extraction Corp. v. Slick's Estate, 386 S.W.2d 180, 191 (Tex.Civ.App.—San Antonio 1964, writ ref'd n.r. e.).

. Compare Sagebrush Sales Co. v. Strauss, 605 S.W.2d 857 (Tex.1980) (jury found that the business affairs of the individual were indistinguishable from the business affairs of the corporation; that the creditor corporation relied on the personal financial statements of the individual; and that the defendant intended to cause its creditor to believe that credit was being extended to him individually) with Pace Corp. v. Jackson, 155 Tex. at 190, 282 S.W.2d at 351 ("Respondent was as well acquainted with the financial structure of Pace Corporation as were [the individual owners].") and Hanson Southwest Corp. v. Dal-Mac Constr. Co., 554 S.W.2d 712, 718 (Tex.Civ.App.—Dallas 1977, writ ref'd n.r.e.) (“[Entering voluntarily] into the contract [though] realizing that it [the ‘shell’] might not be financially sound and despite fruitless efforts to obtain a guarantee from the parent company[, plaintiff construction company cannot now pierce the defendant’s corporate veil].”) and Paine v. Carter, 469 S.W.2d 822, 827 (Tex.Civ. App.— Houston [14th Dist.] 1971, writ ref'd n.r.e.) (“[T]he contract recognizes and assumes the separate existence of [the companies. Choosing] to deal with both ... in their separate legal capacities [, their independence will not be disregarded now....] Moreover, where a party knows of the relationship between a corporation and its shareholders and chooses freely and voluntarily to deal with them in their respective capacities, he is estopped to claim that the corporate form should be ignored].") and Atomic Fuel, 386 S.W.2d at 191 (“Atomic, with full knowledge, chose to deal with the corporations to the exclusion of [the owner].").

. As the district court noted, defendants' $2,361,678 demand for statutory usury treble damages is completely unsupported by the evidence; what calculation allowed them to reach the base sum they utilized escapes us, as it did the district court. Neither in their appellate briefs, nor at oral argument, could LDBrinkman Corp.’s present counsel satisfy this confusion. Reference to interest accrued at the time of trial and to the cross-examination of Hollingsworth indicates the interest claimed to that time on the loan, but why LDBrinkman Corp. chooses that sum (without set-off for statutory prejudgment interest, we note) eludes our understanding.

. There are Texas cases that imply, based upon state civil procedure anomalies, that amendment of the pleadings does not cure usury created by the filing of an earlier pleading. See, e.g., Tyra v. Bob Carroll Constr. Co., 639 S.W.2d 690 (Tex.1982); Nationwide Fin. Corp. v. English, 604 S.W.2d 458 (Tex.Civ.App.—Tyler 1980, writ dism’d). However, under Fed.R.Civ.P. 15, an amended pleading is expressly deemed to "relate back” to the commencement of an action. Notwithstanding what may be the rule prevailing in the Texas state courts, in a diversity case rule 15 is procedural, and this question should be viewed solely as a matter of federal law. See, e.g. Seidman v. Fishburne-Hudgins Ed. Found., Inc., 724 F.2d 413 (4th Cir.1984); Davis v. Piper Aircraft Corp., 615 F.2d 606 (4th Cir.), cert. dism’d, 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1141 (1980); 3 J. Moore, Moore's Federal Practice ¶ 15.02[3] at 15-16 (2d ed. 1985). The filing of the third amended complaint thus defeats the usury argument since, as Gibraltar correctly contends, there is no comparable federal rule creating a cause of action, for usury or otherwise, solely from the pleadings.

. See Danziger v. San Jacinto Sav. Ass’n, 732 S.W.2d 300, 305 (Tex. 1987) (Gonzalez, J., concurring) ("This court has not directly faced this issue [whether] pleadings alone can constitute the charging of usurious interest.... The better rule is that the filing of a petition may constitute the charging of usurious interest only when the underlying agreement is usurious[, because] the usury must be established on the face of the loan instrument [and] errors in drafting of a complaint cannot change the terms and meaning of the original agreement.”) (emphasis in original; citing Fibergrate and distinguishing Tyra and Nationwide Fin.; other citations omitted).

. As to Brinkman, the district court also held that he lacked standing to assert the statutory penalties for usury, because — as a non-obligor— he had no contractual liability absent a finding of “alter ego” liability. Greenway Bank & Trust v. Smith, 679 S.W.2d 592 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). We express no view whether this is a correct reading of the usury provision.

. See Petroscience Corp. v. Diamond Geophysical, Inc., 663 S.W.2d 68, 70 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.) ("We hold that when a pleading (constituting the sole evidence of a “charge”) admittedly seeking a usurious rate of interest is abandoned and amended so as to seek a lawful interest rate before any defense of usury is asserted, as a matter of law *1297 no usurious ‘charge’ has been made.”). See also Killebrew v. Bartlett, 568 S.W.2d 915, 917 (Tex. Civ.App.—Amarillo 1978, no writ) (second amended complaint dropped usurious interest demand, so jury’s refusal to find usury left undisturbed because debtor failed to prove "charging" as a matter of law); but see Mbsouri-Kan-sas-Texas R.R. v. Fiberglass Insulators, 707 S.W. 2d 943, 950 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.) (based upon pxe-Danziger dicta from the Supreme Court and distinguishable appellate precedent, questioned implications of Petroscience and even the validity of Killebrew, but nonetheless concluded that oral usurious interest demand was not a "charging”; no usurious pleadings had been filed).

. Pope v. Rollins Protective Serv. Co., 703 F.2d 197 (5th Cir.1983); Nowell v. Dick, 413 F.2d 1204 (5th Cir.1969); Ford Motor Co. v. Mathis, 322 F.2d 267 (5th Cir.1963).

. Ratner v. Sioux Natural Gas Corp., 770 F.2d 512, 519 (5th Cir.1985); Conan Properties, Inc. v. Conans Pizza, Inc., 752 F.2d 145 (5th Cir.1985); Wood v. Diamond M Drilling Co., 691 F.2d 1165 (5th Cir.), cert. denied, 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 947 (1982); Calloway v. Manion, 572 F.2d 1033 (5th Cir..1978).

. E.g., Hi-Line Elec. Co. v. DowCo Elec. Prod., 765 F.2d 1359, 1362 (5th Cir.1985); C.E. Serv., Inc. v. Control Data Corp., 759 F.2d 1241, 1248 n. 10 (5th Cir.), cert. denied, 474 U.S. 1037, 106 S.Ct. 604, 88 L.Ed.2d 583 (1985); Union Carbide Corp. v. UGI Corp., 731 F.2d 1186, 1189-90 (5th Cir.1984); Cook Indus., Inc. v. Community Grain, Inc., 614 F.2d 978, 980 (5th Cir.), cert. denied, 449 U.S. 952, 101 S.Ct. 356, 66 L.Ed.2d 216 (1980).

. Clements v. Withers, 437 S.W.2d 818, 821 (Tex.1969); White v. Larson, 586 S.W.2d 212, 215 (Tex.Civ.App.—El Paso 1979, no writ); Armendariz v. Mora, 553 S.W.2d 400, 404 (Tex.Civ. App.—El Paso 1977, writ ref'd n.r.e.).

. The final instruction painstakingly elaborated the law:
Gibraltar also contends that LDBrinkman Corporation and Lloyd Brinkman, individually, wrongfully interfered with the contractual obligation of Brinkcraft Development, Inc. under its note to Gibraltar. To prove wrongful interference, Gibraltar must prove each of the following elements by a preponderance of the evidence. First, the existence of a contract. Second, an intentional and willful act of interference with the contract that was calculated to damage Gibraltar. Third, lack of sufficient excuse or justification on the part of what was alleged to have interfered and, fourth, that such intentional act was a proximate cause of actual damages. You are instructed that interference with contract is privileged where it results from the exercise of a party's own rights or where the party possesses an equal or superior interest to that of the Plaintiff in the subject matter. [Emphasis added.]

. Stone v. Lawyers Title Ins. Corp., 554 S.W.2d 183, 185 (Tex.1977); Custom Leasing, Inc. v. Texas Bank & Trust Co., 516 S.W.2d 138, 143 (Tex. 1974); Oilwell Division, U.S. Steel Corp. v. Fryer, 493 S.W.2d 487, 491 (Tex.1973); see also Valdes, 810 F.2d at 1350; Chemetron Corp. v. Business Funds, Inc., 682 F.2d 1149, 1171-72 (5th Cir.1982), vacated on other grounds, 460 U.S. 1007, 103 S.Ct. 1245, 75 L.Ed.2d 476 (1983).

. This fraud theory is called misrepresentation of future intendment in some of the older cases. See, e.g. Statham v. City of Tyler, 257 S.W.2d 742, 744 (Tex.Civ.App.—Texarkana 1953, writ ref'd n.r.e.).

. The trial court properly and comprehensively instructed the jury on this point:
A promise to do something in the future cannot be the basis of a claim for fraud unless the promissor, at the time he made the promise, made it with a positive intent not to perform it. Mere failure to perform a promise to do something in the future does not establish that a party had no intention to perform at the time the promise was made.

. The subject interrogatories and answers read as follows:
1. Do you find that LDBRINKMAN CORPORATION committed fraud against GIBRALTAR SAVINGS by making any of the following alleged misrepresentations:
ANSWER: “YES" OR “NO” AS TO EACH, (a) That the total existing debt of Brinkcraft Inc. other than the debt owing to LDBrink-man Corporation did not exceed $2,500,000.
Answer: Yes.
(b) That the business of Brinkcraft, Inc. and Brinkcraft Development, Inc. was ongoing and successful in scope.
Answer: Yes.
******
ANSWER QUESTION NO. 2 ONLY IF YOU ANSWERED “YES” TO ANY PART OF QUESTION NO. 1, OTHERWISE SKIP TO QUESTION NO. 5.
2. What amount of money, if paid now in cash, do you find would fairly and reasonably compensate GIBRALTAR SAVINGS for the fraud, if any, committed against it by the LDBRINKMAN CORPORATION?
Answer: $6,000,000.

. These representations were obviously false in several respects. BDI had "outside debt” (i.e., debt owed to banking institutions) of nearly $1 million beyond the $2.5 million owed to Banc-Texas. It is undisputed that $475,000 was used out of the Gibraltar loan proceeds to reduce that additional outside debt, and that fact was not disclosed to Gibraltar until the June 10, 1985, meeting. Those funds were supposed to be used to complete the development projects, the sale of which then would have been the source of repayment of Gibraltar’s $5 million loan. Without such specific repayment arrangements, denominating the $2.5 for "working capital” would have been unnecessary; if Gibraltar had intended to allow the half not going to BancTex-as to be fully discretionary funds, such denomination, and indeed dividing the loan into halves, were merely superfluous.

. Gibraltar was given BI’s audited financial statements revealing BI’s outside debt to be *1300 much more than $2.5 million. These fiscal reports were put into evidence during the case in chief.

. Griffin v. Matherne, 471 F.2d 911, 917 (5th Cir.1973); R.B. Co. v. Aetna Ins. Co., 299 F.2d 753, 760 (5th Cir.1962); Aquachem Co. v. Olin Corp., 699 F.2d 516, 520 (11th Cir.1983).

. Woody had to correct one reference he made to BI, when he had meant to say BDI. It also appears from context that Hufhines, BI’s comptroller, misspoke in the same way during his testimony.

. Under Fed.R.Civ.P. 16(e), omission from the pretrial order means that a claim for misrepresentation of BDI's financial status was never properly incorporated into Gibraltar's case. Valdes, 810 F.2d at 1357; Woods ex rel. Woods v. International Harvester Co., 697 F.2d 635, 639 (5th Cir.1983). While evidence as to both BI’s and BDI’s finances was admitted (usually without objection), we have held that the Federal Rules of Civil Procedure prohibit creation and introduction of new facts, theories, or causes of action on the eve of trial, because a “defendant would be facing the possibility of being held liable under a claim it had no opportunity to evaluate and defend against.” Flannery v. Carroll, 676 F.2d 126, 131 (5th Cir.1982). See also Valdes, 810 F.2d at 1357; Swift v. State Farm Mut. Auto. Ins. Co., 796 F.2d 120 (5th Cir.1986).

. Zar v. Omni Indus., Inc., 813 F.2d 689, 693 (5th Cir.1987).

. Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432 (Tex.1986); Trenholm v. Ratcliff, 646 S.W. 2d 927 (Tex.1983); New Process Steel Corp. v. Steel Corp., 703 S.W.2d 209 (Tex.App.—Houston [1st Dist.] 1985, no writ).

. Compare Stone v. Lawyers Title Ins. Corp., 554 S.W.2d 183, 185 (Tex.1977) with William B. Roberts, Inc. v. McDrilling Co., 579 S.W.2d 335 (Tex.Civ.App.—Corpus Christi 1979, no writ). See also Custom Leasing, Inc. v. Texas Bank & Trust Co., 516 S.W.2d 138, 143 (Tex.1974).

. Farlow testified that Ratcliffe told him,
[Y]ou know that Brinkman is not going to let one of his companies go bad and we are going to keep this as a going concern, and this money is going to enable us to work this situation out. [Emphasis added.]
Summarizing his testimony, Farlow said that he would not have recommended the BDI loan, and the loan committee surely would not have approved it, had it not been for the implied promise that LDBrinkman Corp. would continue to hold at least a one-half interest in the Brinkcraft subsidiaries. In response to a probing inquiry of his recollection of the purport of the "ongoing and successful” statements, Farlow testified:
Ratcliffe and I had an understanding that ... it would be a going concern as long as there was money owed to our company. [H]e said they were not going to sell it, they were not going to dispose of it until we were paid off, so I assume that we are saying the same thing. It was never represented to me any other way [but] that they were ongoing, successful companies. [Emphasis added.]

.Ratcliffe’s representations that BI and BDI were ongoing and successful in scope likewise were false representations, both of existing fact and as to LDBrinkman Corp.’s and Brinkman’s secret intention not to perform. As evidenced by internal memoranda, LDBrinkman Corp. had determined, as early as March 1984, that BI was unprofitable and began its efforts to get rid of the subsidiary while negotiating with Gibraltar. When Herb Bradshaw was brought on board, it was expressly envisioned that he would divest BI. In June 1984, LDBrinkman Corp.’s board voted to dispose of BI for "80% of its book value.” In LDBrinkman Corp.’s 1984 SEC filing, BI was "discontinued" as an LDBrinkman Corp. subsidiary effective August 1, 1984, and was no longer consolidated in LDBrinkman Corp.’s financial reporting. The appellant’s brief itself admitted that “[discontinuance reporting is simply a form of accounting required when a sale of business is contemplated.” Since *1302 the Woody-McDougal buy-back had fallen through by this year-end filing, the contemplated sale was not that to management.
While the buy-back of BDI by the subsidiaries' officers would have left the parent corporation with significant interests in, and control over, the former subsidiary and left it as an "ongoing" enterprise, even after Woody and McDougal pulled out of the deal, LDBrinkman Corp. continued the divestiture effort; on September 6, 1984 (the day after Farlow presented the loan documents to LDBrinkman Corp.'s officers in Kerrville and the day the BDI buy-back was to occur), Ratcliffe made inquiries as to writing both BDI and BI off of the holding company’s accounts. On September 14, 1984, the very day that Ratcliffe was signing the loan documents in Kerrville, LDBrinkman Corp.'s San Antonio accountants were obtaining information on how to treat BI as a "disposal segment” of the holding company's business.

. Valdes, 810 F.2d at 1350 n. 3; J.L. Williams & Co. v. Robert E. McKee, Inc., 612 S.W.2d 649, 651 (Tex.Civ.App. — Dallas 1981, writ ref'd n.r. e.).

. Ratcliffe represented that LDBrinkman Corp. would continue its financial support of BI and BDI until such time as the loan was repaid. LDBrinkman Corp. makes no contention that it was impossible for LDBrinkman Corp. to perform these promises; only that Gibraltar was not entitled to rely upon them. Given their past relationship, however, Farlow was justified in relying upon representations by his long-term friend and client. Ratcliffe selected BDI as a convenient "shell corporation” through which to borrow funds. Ratcliffe’s representation that the subsidiaries would be "ongoing" was reasonably believed, and Farlow’s testimony was accepted by the jury. Given that the jury was properly instructed, it must be presumed that it determined that these representations were an unambiguous declaration of positive facts which LDBrinkman Corp. secretly had already determined to contravene.

. Ratner v. Sioux Natural Gas Corp., 770 F.2d 512, 519 (5th Cir.1985) (failure to prove each element in relation to each alleged misrepresentation required reversal of general verdict of common-law fraud with regard to that statement); Mozingo v. Correct Mfg. Corp., 752 F.2d 168, 176 (5th Cir.1985) (when particular elements of a general verdict lack adequate support in the record ... a new trial is required); Statham v. City of Tyler, 257 S.W.2d at 744 (failure to prove any one element as to the five alleged misrepresentations of existing fact or future intendment entitled the defendant to summary judgment).

. Laughlin v. FDIC, 657 S.W.2d 477, 482 (Tex. App.—Tyler 1983, no writ); Lewis v. River Oaks Capital Corp., 466 S.W.2d 348, 352 (Tex.Civ.App.—Houston [1st Dist.] 1971, writ ref'd n.r.e.).

. The charge read:
You are further instructed that fraud does not exist if a misrepresentation did not induce a transaction, did not deceive the injured person or otherwise affect his or its actions. In other words, if you find that the complaining party would have engaged in the transaction anyway and that the alleged misrepresentations had no effect upon the decision, there was no reliance and there can be no recovery.

. The parties’ conflicting characterizations of the evidence are based upon the credibility or non-credibility assigned to certain witnesses, but "[i]t is not the function of this court to make credibility choices and findings of fact.” Redditt v. Mississippi Extended Care Centers, Inc., 718 F.2d 1381, 1386 (5th Cir.1983). See also Smith v. Texas Dept. of Water Res., 799 F.2d 1026, 1031 (5th Cir.1986), cert. denied, — U.S. -, 108 S.Ct. 1012, 98 L.Ed.2d 977 (1988); Ratliff v. Governor’s Highway Safety Prog., 791 F.2d 394, 401 (5th Cir.1986); Sylvester v. Callon Energy Serv., Inc., 724 F.2d 1210, 1216 (5th Cir.1984).

. If there had been a specific finding on reliance, we would be even more hesitant to overturn the verdict, but the obscurity of the one element in a general instruction does not necessarily indicate that the jury ignored the individual elements of the claims presented to it. Ratner v. Sioux Natural Gas Corp., 770 F.2d at 518 ("The frailty of a general verdict does not absolve us from upholding it if possible. Cases that justify disregarding the jury’s determinations seldom arrive in this court.’’).
We cannot conclude that the jury overlooked its duty to find each element specifically. We cannot say whether, if the issue had been squarely addressed, we would have found the testimony of Gibraltar’s employees so insubstantial that no rational trier-of-fact could have found that Gibraltar actually relied; absent such a conclusion and without any indication, such as a faulty or less direct charge, that the jury did not address the reliance issue with respect to each count, we cannot hold that the record lacks sufficient evidence to allow reasonable jurors to find that the lender actually relied upon the "ongoing and successful” representation either in issuing the loan or in accepting only BI’s guaranty, rather than demanding one from the holding company. Texoma AG-Products, Inc. v. Hartford Acc. & Indem. Co., 755 F.2d 445, 448 (5th Cir.1985) (‘We decide only if reasonable jurors could agree with this verdict.”).

. A guaranty is an undertaking by the guarantor to answer for the payment of some debt or performance of a contract of another person in the event of the principal’s default. It has independent value, United States v. Vahlco Corp., 800 F.2d 462 (5th Cir.1986), but it is not such that Gibraltar’s recovery should be discounted by more than the amount received in settlement from Woody and McDougal. Of course, the guaranty of an insolvent guarantor is worthless, and so BI’s surety of its subsidiary has no present value. But the worth of the agreed judgment against BI needs to be ascertained.

. Tex.Civ.Prac. & Rem.Code § 17.001 (Vernon’s) (formerly Tex.Rev.Civ.Stat.Ann. art. 1987, repealed effective Sept. 1, 1985).

. Western Cottage Piano & Organ Co. v. Anderson, 101 S.W. 1061, 1064 (Tex.Civ.App.— Fort Worth 1907, error ref’d) (plaintiff was not required to prove that a third-party’s chattel mortgage was insufficient security for the loan which the defendant induced the plaintiff to make to that third party, in order for suit against the fraudulent inducer to go forward). See also 38 C.J.S. Guaranty § 92 (1987 Supp.); United States v. Kohn, 243 F.Supp. 293, 296 (W.D.S.C. 1965).

. E.g., In re Letterman Bros. Energy Sec. Litig., 799 F.2d 967 (5th Cir.1986), cert. denied, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987); Huddleston v. Herman & MacLean, 640 F.2d 534 (5th Cir. Unit A Mar. 1981), aff’d in part, rev’d in part, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

. See McClure v. First Nat'l Bank, 497 F.2d 490, 493-94 (5th Cir.1974), cert. denied, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); Bellah v. First Nat'l Bank, 495 F.2d 1109, 1111 (5th Cir.1974).

. E.g., Phillips Petroleum Co. v. Stahl Petroleum Co., 569 S.W.2d 480, 485 (Tex.1978); Crown Cent. Petroleum Corp. v. Nat'l Union Fire Ins. Co., 768 F.2d 632 (5th Cir. 1985); Union Bank v. First Nat’l Bank, 677 F.2d 1074 (5th Cir.1982). In the recent landmark Texas case of Cavnar v. Quality Control Parking, Inc., 696 S.W.2d 549, 552-53 (Tex.1985), the court held that in a tort action, interest as damages is compensation allowed by law "as additional damages for lost use of money” during the lapse of time between the accrual of the claim and the date judgment is entered. Citing numerous Texas decisions, the Texas Supreme Court held that plaintiffs have been permitted to recover prejudgment interest on both liquidated and unliquidated claims in both contract and tort disputes. See, e.g., Miner-Dederick Const. Corp. v. Mid-County Rental Serv., Inc., 603 S.W.2d 193, 200 (Tex.1980). The court concluded that as a matter of law, a prevailing plaintiff may recover prejudgment interest on damages that have accrued by the time of judgment. Cavnar, 696 S.W.2d at 554.

.During appeal of this matter, Gibraltar finally entered a stipulation on June 1, 1988, that, if this judgment were affirmed by us, it would offset any direct recovery from LDBrinkman Corp. or Brinkman against the agreed judgment of $5 million and $5000 attorneys’ fees which it had previously obtained against the now-bank *1306 rupt successors to BI and BDI. See Gibraltar Savings v. Lanchart, Inc. f/d/b/a Brinkcraft, Inc., et al., No. SA-85-2166 (W.D.Tex. Dec. 4, 1986). BI’s guarantee may thus prove worthless, once the bankruptcy of its successor corporation is concluded, but if Gibraltar has received value on the agreed judgment, the lender cannot be allowed a double recovery.
Woody’s and McDougal’s settlement for $700,-000 and the assignment of their interests in the joint ventures must be factored into any recalculation; whatever value Gibraltar thus recovered, or may realize, on the assignments, must offset the liability recognized by this decision. To the extent that Gibraltar is entitled to sums in excess of these prior recoveries on that debt, it may pursue LDBrinkman Corp., which enjoys a theoretical, if not realistic, right of contribution or subrogation against BI and BDI, if the now-bankrupt successor retains any assets.